**In the Matter of the ESTATE OF John J. GIESSEL, Deceased.**

No. 01–86–0717–CV.

Court of Appeals of Texas, Houston (1st Dist.).

May 14, 1987.
Rehearing Denied June 18, 1987.

Thomas H. Watkins, Hilgers & Watkins, P.C., Austin, for appellants.

Quincy A. James, Robert E. Hudson, Houston, for appellee.

Before COHEN, JACK SMITH and DUGGAN, JJ.

## OPINION

COHEN, Justice.

Based on the jury's finding that Rosie Kuchera was John J. Giessel's common-law wife, the court rendered judgment declaring her to be Giessel's sole heir. The appellants, Giessel's cousins, challenge the legal and factual sufficiency of the evidence proving the marriage.

In considering a legal sufficiency, or no evidence, point, we view the evidence in the light most favorable to the jury's finding, considering only the evidence and inferences therefrom that support the finding and rejecting all other evidence and inferences. *Renfro Drug Co. v. Lewis*, 149 Tex. 507, 235 S.W.2d 609 (1951). In considering a factual sufficiency point, we evaluate all the evidence, and reverse the judgment only if the jury's finding is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951). When there is conflicting evidence on a fact question, the verdict will generally be upheld. *Rego Co. v. Brannon*, 682 S.W.2d 677, 680 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.).

The record reflects that Giessel's first marriage ended in divorce, and that Kuchera's first marriage ended in 1963 with the death of her husband. After her husband's death, Kuchera lived in a small home on a 150-acre tract of land that she and her husband had owned. Giessel lived nearby with his parents. In 1964, Giessel and Kuchera began living together in her home.

Kuchera testified that on September 18, 1964, she asked Giessel to marry her in a church wedding. He told her that "he got married by a preacher the first time and it didn't work out.... [and] he said we was going to get married under God's eyes and that was good enough." She testified that they lived together in a series of homes on her property until his death on November 3, 1984, at the age of 69, and that they had never spent a night apart.

The record reflects that Giessel was unemployed and penniless when he began living with Kuchera. Around 1970, Giessel placed his parents in a nearby nursing home, where they remained until their deaths in 1976. During this time, Giessel paid what he could for his parents' care. Kuchera testified that between the mid-1960's and the mid-1970's, Giessel only earned between $1.25 and $3.00 per hour, that she helped Giessel pay the nursing home bills, and that after the death of Giessel's parents, she helped Giessel pay their debts.

The record reflects that Kuchera's mother lived with them for about four months and that Kuchera's brother lived with them from about 1980 until Giessel's death.

Between 1974 and 1980, Kuchera executed an oil and gas lease and two pipeline easements. Each instrument described her as "Rosie Kuchera, a widow," and she signed each of them Rosie Kuchera. In 1978, Giessel executed an oil and gas lease on the property he inherited from his parents. The lease described him as "John J. Giessel, a single man."

With the income from the oil leases, Giessel and Kuchera built a new house on Kuchera's property. This house was built on the same spot as the house they had been living in since 1964.

Giessel's death certificate listed him as divorced with no surviving spouse. Several witnesses testified that Reverend Thrasher referred to Kuchera as "Giessel's special friend," during Giessel's funeral eulogy.

The record is unclear regarding who provided the information to the funeral home and to Reverend Thrasher at the time of Giessel's death. Kuchera testified that Lilly May Clark, her niece, made Giessel's funeral arrangements. Donald Strickland, the funeral home director, testified that their records listed Kuchera as the "# 1 Informant." However, he also testified that this was primarily because she was responsible for paying the funeral expenses. All of the funeral home documents signed by Kuchera were also signed by Fritzie Steenken, Giessel's cousin. They also contain Steenken's phone

number with the notation "to locate the grave," apparently because the gravesite was owned by Giessel's parents. The documents also reflect "Family will be at.... [C]all Ruth *Edwards*," and her phone number. (Emphasis in original.)

Strickland testified that he learned on the day of the funeral that Kuchera "lived with Giessel as his wife for 20 years," but that it was too late to retract the obituary notices listing Kuchera as Giessel's friend. He testified that he regretted the mistake.

Wayne Edwards owned land next to Giessel and Kuchera. He testified that he had known Giessel since they were both children, that Edwards' father helped Giessel and Kuchera build a house on Kuchera's land sometime in the mid 1960's, and that he believed that Kuchera and Giessel were married. In 1980 or 1981, Giessel told Edwards, "Rosie is my wife, and everybody knows that, and she is going to be taken care of and you don't have to worry about it." He also testified that Giessel and Kuchera "referred to each other as a couple, as a married couple." He testified that the local community referred to them as John and Rosie, but that others, particularly hunters and contractors, referred to them as Mr. and Mrs. Giessel, and that neither Giessel nor Kuchera ever denied or corrected the label.

Betty Lou Poehl testified that she had known Giessel since 1964 and Kuchera since 1965, and that she knew Kuchera as Rosie Kuchera Giessel. Poehl worked with both Kuchera and Giessel. One morning at work, she asked Giessel if he and Kuchera were married, and he responded that "definitely that they were husband and wife, that he could never have a woman that was more his wife than Rosie." Kuchera was present during the conversation and said that "we did not need a marriage license to be married." Poehl testified that Kuchera and Giessel had a reputation for being married, and that on many occasions she heard Giessel introduce Kuchera as his wife, and heard Kuchera introduce Giessel as her "old man." Poehl confirmed that Kuchera helped Giessel pay off the debts accumulated after Giessel's parents' deaths.

W.D. Anderson testified that he was acquainted with Giessel and Kuchera from 1979 to 1983 as a result of his employment with TIPCO, a company that was drilling oil wells on Kuchera's property. He testified that he believed that Kuchera was Giessel's wife, that on several occasions his employees told him "we saw him and his wife pass a while ago going that way," that they had a reputation for being married, and that he never heard any differently.

Beverly Upchurch, Giessel's second cousin, testified that she considered Kuchera and Giessel to be married because they were always referred to as "Johnny and Rosie, like one sentence ... we just considered them a twosome." Upchurch also testified that the Christmas cards that she received from Giessel were signed by Giessel only, and not by Kuchera.

Glen Goodwin, Upchurch's ex-husband, testified that he visited Giessel and Kuchera on many occasions, and that he considered them married. Sidney Becvar, Billy Joe Shupak, Earvin Moore, Wilbert Seuhs, and Robert Benn testified that they believed that Giessel and Kuchera were married and that they had a reputation for being married.

Samuel Clark testified that during a conversation between Giessel and an oil field worker, both Giessel and the worker referred to Kuchera as Giessel's wife. He also testified that he considered them to be married.

James Nutt testified that he had known Kuchera and Giessel since 1970, when he began leasing Giessel's property for deer hunting. He believed that Giessel and Kuchera were married, and believed that they had a reputation for being married. On cross-examination, he testified that he never heard Giessel introduce Kuchera as "my wife," but that he assumed that they were married because they were living together and because he had not heard differently. Alfred Gaskamp, another hunter, testified similarly to Nutt.

Alvin Perry testified that, while he was in college, he was employed by Giessel to build a fence, and that he thereafter worked sporadically for Giessel from 1982

until Giessel's death. Perry testified that he referred to Kuchera and Giessel as Mr. and Mrs. Giessel, that he introduced them to his girlfriend as Mr. and Mrs. Giessel, and that neither one corrected him. Perry also testified that he considered them to be married and that they had a reputation for being married.

The record reflects that neither Kuchera nor Giessel told any of Giessel's relatives that they were married; that Kuchera's tax returns, driver's license, bank account, social security card, and pay check were in the name of Kuchera; that her tax returns listed her as single; that she and Giessel maintained separate bank accounts; and that they did not have any joint accounts or jointly owned property. Kuchera testified that she never used the name Giessel because she thought that she could not change her name to Giessel without a formal marriage license.

Several witnesses testified that Giessel and Kuchera always did everything together; they worked at the aluminum ladder plant together, they worked Kuchera's land together, they went shopping together, and they socialized together locally. On the other hand, several of Giessel's relatives testified that Giessel never brought or talked about Kuchera on the several occasions that he attended family functions.

Several of Giessel's cousins testified that they regularly received Christmas cards from him, but that they were only signed by Giessel and not by Kuchera. Laverne Knittel, Ouida Rohde, and Johnnie Mueller, Giessel's cousins, testified that Giessel neither told them that he was married, nor mentioned Kuchera's name. R.A. Williams testified that he asked Giessel if he was married and that Giessel said, "Hell, no, I've got better sense."

Leroy Seiler and William James were married to Giessel's cousins. Seiler testified that at a relative's birthday party in 1982, several men were standing around talking and Giessel was asked when he was going to get married. Giessel replied, "Hell, no, I'm ain't going to get married.... I been married before and I won't get married again." Someone said,

"Well, what about your sex life?" and Giessel said, "If I want sex I'll go get some and go home."

James testified that Giessel said, "Hell, no, I've been married once, you don't think I'm another fool. All you have to do is go out and get you a little bit and then go back home." James also testified that he had fished on Giessel's property on three occasions, and that he never met Kuchera.

Leslie Rohde, husband of Ouida Rohde, Giessel's cousin, testified that he hunted on Giessel's property in 1983, but that he never met Kuchera, that he never saw Kuchera and Giessel working together, and that Giessel never told him that he was married.

Gladys Eloff, Giessel's cousin, testified that Giessel introduced Kuchera to her in 1981 as "Rosie," but that she did not know that Giessel and Kuchera were living together. She also testified that 10 days after the funeral, Kuchera told her that there was no will, and that she did not want any of Giessel's money.

Doris James, Giessel's cousin, testified that she saw Giessel at family gatherings, but that he never mentioned that he had a wife. Four weeks after the funeral, Kuchera told her that there was not a will, that "Johnny never wanted to get married," and that she believed that Fritz Steenken would get the estate.

██ A common-law marriage requires that the parties: (1) agree to be married; (2) live together after the agreement as husband and wife; and (3) represent to others that they are married. Tex.Fam. Code Ann. sec. 1.91 (Vernon 1975); *see Humphreys v. Humphreys*, 364 S.W.2d 177 (Tex.1963); *Ex parte Threet*, 160 Tex. 482, 333 S.W.2d 361 (1960). The statutory requirement of "represented to others" is synonymous with the judicial requirement of "holding out to the public." *Estate of Claveria v. Claveria*, 615 S.W.2d 164, 166 (Tex.1981); *Warren v. Kyle*, 565 S.W.2d 313, 316 (Tex.Civ.App.—Austin 1978, no writ).

██ The appellants first contend that there was no "holding out": (1) because isolated references to each other as hus-

band and wife are no evidence of "holding out"; (2) because assumptions by the community are irrelevant; and (3) because there were inconsistent representations.

In *Ex parte Threet*, cited by appellants, the court held that isolated references, without more, were no evidence of a holding out. In the instant case, unlike *Threet*, the references by Kuchera and Giessel to each other as "husband" and "wife" were not the only evidence of their "holding out." The record is replete with evidence of Kuchera's and Giessel's conduct and reputation. In *Rosales v. Rosales*, 377 S.W.2d 661, 664 (Tex.Civ.App.—Corpus Christi 1964, no writ), the court held that "holding out" could be established by conduct, and in *Associated Indemnity Corp. v. Billberg*, 172 S.W.2d 157, 164 (Tex.Civ.App.—Amarillo 1943, no writ), the court held that spoken words were not necessary to establish a "holding out."

Moreover, in *Threet*, the purported "secret" common-law marriage lasted only two months, after which the 15–year-old girl testified that she stopped "dating" the purported husband. The purported spouses never spent an entire night together, and the closest thing to cohabitation was the male remaining with the girl at her mother's house until dawn one night when her parents were away. *Threet* is clearly distinguishable.

*Gary v. Gary*, 490 S.W.2d 929 (Tex.Civ. App.—Tyler 1973, writ ref'd n.r.e.), cited by appellants as evidence of no "holding out," is distinguishable because the testimony of the purported wife conclusively proved that there was no agreement to be married. *Id.* at 934. The language regarding a "holding out" was, therefore, dicta, unnecessary to the court's holding. Moreover, the evidence of holding out is much stronger in the instant case than it was in *Gary*.

We conclude that there was sufficient evidence of "holding out" that exceeded isolated references to one another as spouses.

We reject appellants' contention that opinion and reputation testimony are irrelevant in proving holding out. Opinion and reputation testimony indicate that the cou-

ple's conduct was viewed as a representation that they were married. As stated in *Grigsby v. Reib*, 105 Tex. 597, 608, 153 S.W. 1124, 1130 (1913):

The cohabitation must be professedly as husband and wife, and public, so that by their conduct towards each other they may be known as husband and wife.

*See also Brooks v. Hancock*, 256 S.W. 296 (Tex.Civ.App.—Texarkana 1923, no writ) (reputation is a factor to be weighed).

We also reject appellants' contention that Kuchera was not married, as a matter of law, because she denied the marriage in tax returns, social security, driver's license, bank, and pay records. The argument fails to "consider only that evidence most favorable to the issue and disregard entirely that which is opposed to it or contradictory to its nature." *Rosales*, 377 S.W.2d at 664; *see also Tatum v. Tatum*, 478 S.W.2d 629, 633 (Tex.Civ.App.—Fort Worth 1972, writ dism'd) (once the marriage exists, subsequent disclaimers are of no effect). Kuchera's representations in tax returns and other documents that she was single go to the weight of the evidence; they do not negate a marriage, as a matter of law.

Appellants next contend that there is no evidence of an agreement to be married. They argue that, as a matter of law, no agreement to be married can be inferred from cohabitation and representations, Tex. Fam.Code Ann. sec. 1.91(b), because there is direct evidence that Giessel and Kuchera did not always represent themselves to be married.

We must decide whether there was evidence that the agreement was invalid as a matter of law, not whether there was some evidence that the parties did not always represent themselves to be married. *Schwingle v. Keifer*, 105 Tex. 609, 153 S.W. 1132 (1913); *Perales v. Flores*, 147 S.W.2d 974 (Tex.Civ.App.—San Antonio 1941, writ ref'd). Appellants' construction would require a holding of no agreement, as a matter of law, whenever there was a fact issue regarding cohabitation or holding out.

In the instant case, Kuchera testified clearly and positively that she and Giessel had agreed to be married "in God's eyes." In *Grigsby v. Reib*, 153 S.W. at 1130, the court recognized that marriage was "a status ordained by God...." Kuchera's testimony was direct evidence of an agreement. It did not, as a matter of law, negate an agreement to be married. Therefore, if more evidence of an agreement is necessary, it may be inferred from cohabitation and representations. Tex.Fam.Code Ann. sec. 1.91(b).

The first point of error is overruled.

 In their second point of error, the appellants contend that the evidence is factually insufficient.

There was substantial evidence before the jury to support either an affirmative or negative answer to the sole special issue. The appellants did not explain the evidence supporting the jury's verdict. Kuchera explained, however, that she continued to use the name Kuchera in various documents and records only because of her mistaken belief that she needed a ceremonial marriage to do otherwise.

The jury could have placed less weight on the testimony of Giessel's relatives and their spouses because they had a financial stake in the outcome, whereas, none of Kuchera's witnesses did. Few of Giessel's cousins and their spouses were aware that he and Kuchera were living together, and most had never been to Kuchera's and Giessel's home. In *Schwingle v. Keifer*, 135 S.W. 194, 197 (Tex.Civ.App.—San Antonio 1911), *aff'd*, 105 Tex. 609, 153 S.W. 1132 (1913), the court held that the "reputation as to marriage *vel non* must arise where both parties reside, and among those who are cognizant of the cohabitation."

We may not substitute our judgment for the jury's. The verdict is not so against the great weight and preponderance of the evidence as to be manifestly wrong and unjust. The second point of error is overruled.

The third point of error contends that the trial court erred by instructing the jury according to Family Code sec. 1.91(b). We overrule this contention for the reasons stated in our discussion of the first point of error.

 The fourth point of error contends that the trial court erred in instructing the jury that the marriage "may" be proved by the three part test of Family Code section 1.91. The appellants contend that the court should have instructed the jury that the marriage *must* be proved by evidence of the three elements, rather than that it may be so proved.

The instruction tracked sec. 1.91 and listed the elements of a common-law marriage in the conjunctive, not the disjunctive. There was no error. Tex.R.App.P. 81(b)(1). The fourth point of error is overruled.

The fifth point of error asserts that the trial court erred in overruling appellants' second motion for continuance. We overrule the point because the motion was not sworn, as required by Tex.R.Civ.P. 251.

The judgment is affirmed.