**David Mark WINFIELD, Appellant,**

**v.**

**Sandra RENFRO, Appellee.**

**No. 01–90–00298–CV.**

Court of Appeals of Texas,
Houston (1st Dist.).

Oct. 10, 1991.

Rehearing Overruled Dec. 12, 1991.

Houston, sitting by assignment.

Tom Alexander, Kevin McEvily, Linda Marshall, and David Sacks, Houston, for appellant.

Earle S. Lily, John F. Nichols, Houston, for appellee.

Before TREVATHAN, C.J., and O'CONNOR and MIRABAL, JJ.

## OPINION

O'CONNOR, Justice.

David Winfield appeals from a judgment which established a common-law marriage with Sandra Renfro and granted them a divorce. We reverse and remand.

## 1. THE CHARGE

■ In point of error one, Winfield contends Renfro did not secure a finding on each essential element of her claim of common-law marriage. Specifically, Winfield claims that the question and the instruction submitted to the jury did not instruct them that both parties must represent to others *in Texas*, that they were married. *Williams v. Home Indem. Co.*, 722 S.W.2d 786, 788 (Tex.App.—Houston [14th Dist.] 1987, no writ) (living together and holding out in another state does not satisfy the requirement of section 1.91). Section 1.91 of the Texas Family Code provides that a common-law marriage may be established by evidence that: (1) the parties agreed to be married, (2) and after the agreement they lived together in this state as husband and wife, and (3) *there* represented to others that they were married. TEX.FAM.CODE ANN. § 1.91(a)(2) (Vernon 1975).

The jury was asked:

Do you find from a preponderance of the evidence that Petitioner and Respondent entered into an informal or common law marriage on or about April 11, 1982? In connection with the foregoing question you are instructed that the elements of an informal or common law marriage are:

1. A mutual agreement to be husband and wife.

2. And, after this agreement they lived together in this state as husband and wife.

3. And, represented to others that they were married.

The agreement of the parties to marry may be inferred or implied if it is proved that they lived together as husband and wife and represented to others that they were married.

A fact may be established by direct evidence or by circumstantial evidence or both. A fact is established by direct evidence when proved by witnesses who saw the act done or heard the words spoken or by documentary evidence. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved. A representation to others that the parties were married may be established by the conduct of the parties or spoken words or a combination of both.

Answer "Yes" or "No"

Answer: _____

Comparing the elements submitted in the charge to the elements in § 1.91 of the Texas Family Code reveals the following:

| ELEMENTS UNDER § 1.91 | ISSUE SUBMITTED |
| --- | --- |
| 1. They agreed to be married | A mutual agreement to be husband and wife. |
| 2. And after the agreement they lived together in this state as husband and wife | After the agreement, they lived together in this state as husband and wife. |
| 3. And **there** represented to others that they were married | And represented to others that they were married |

Except for the omission of the word "there," the instructions tracked the statutory language in § 1.91 of the Texas Family Code. Except for the substitution of the phrase lived together in "this state" for lived together "in Texas" and the omission of the word "there," the jury question and the instructions stated the elements necessary to establish a common-law marriage based on the suggested charge in 5 STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES PJC 201.04a (1989).[1]

■ Error in the jury charge is reversible only if it caused, or was reasonably calculated to cause, and probably did cause, the rendition of an improper judgment. *Island Recreational Dev. Corp. v. Republic of Texas Sav. Ass'n*, 710 S.W.2d 551, 555 (Tex.1986); *Trevino v. Brookhill Capital Resources, Inc.*, 782 S.W.2d 279, 283 (Tex. App.—Houston [1st Dist.] 1989, writ denied); TEX.R.APP.P. 81(b)(1).

Winfield objected to the omission of the word "there" from the charge. The word "there" or the phrase "in Texas" was important because only two items of evidence suggested Winfield may have acquiesced to being identified as married to Renfro, one of which occurred in the Bahamas in November of 1983. In the time period around April 11, 1982, most of the time Winfield and Renfro spent together was outside the state of Texas. We hold it was error to submit the jury question without the word "there" in the charge.

■ Renfro defends the omission of the word "there" from the charge as a broad form submission, which the supreme court requires whenever feasible. *Texas Dep't of Human Services v. E.B.*, 802 S.W.2d 647, 649 (Tex.1990); TEX.R.CIV.P. 277. Rule 277 requires the trial court to "submit such explanatory instructions and definitions as shall be proper to enable the jury to render a verdict." *E.B.*, 802 S.W.2d at 649. We do not agree that the broad form submission excuses the omission of the word "there" or the phrase "in Texas" from the charge on an informal marriage. The evidence in this case on the issue of representations to others *in Texas* that they were married, was close and contested. We conclude the erroneous instruction constituted error that was reasonably calculated to cause and probably did cause the rendition of an improper verdict. *Island*

1. The instruction in the *Pattern Jury Charges* reads: A man and a woman are married if they agreed to be married and after the agreement they lived together in Texas as husband and wife and there represented to others that they were married.

*Recreational Dev. Corp.*, 710 S.W.2d at 555; *Trevino*, 782 S.W.2d at 283; TEX. R.APP.P. 81(b)(1).

We sustain point of error one.

## 2. THE SUFFICIENCY OF THE EVIDENCE

■ In point of error two, Winfield contends the evidence is legally and factually insufficient to support a finding of a common-law marriage. Winfield challenges the sufficiency of the evidence to support each separate element of the cause of action. In reviewing a legal sufficiency of the evidence challenge, this Court must view the evidence in the light most favorable to the jury's verdict, considering only the evidence and inferences that support the finding and disregarding all other evidence and inferences. *Davis v. San Antonio*, 752 S.W.2d 518, 522 (Tex.1988).

■ In reviewing a factual sufficiency point, this Court must evaluate all the evidence, and reverse the judgment only if the jury's finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986). The jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Rego Co. v. Brannon*, 682 S.W.2d 677, 680 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). This Court may not substitute its opinion for that of the jury merely because we would have reached a different result. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 634 (Tex. 1986); *Glockzin v. Rhea*, 760 S.W.2d 665, 666 (Tex.App.—Houston [1st Dist.] 1988, writ denied).

We now look to the record to judge the sufficiency of the evidence to support the three elements of a common-law marriage: (1) agreement to be married; (2) after the agreement, living together in Texas as husband and wife; and (3) representing to others in Texas that they are married. TEX.FAM.CODE ANN. § 1.91(a)(2) (Vernon 1975); *see Ex parte Threet*, 160 Tex. 482, 333 S.W.2d 361, 364 (Tex.1960); *In re Estate of Giessel*, 734 S.W.2d 27, 30 (Tex. App.—Houston [1st Dist.] 1987, writ ref'd

n.r.e.). A common-law marriage does not exist until the concurrence of all three elements. *Bolash v. Heid*, 733 S.W.2d 698, 699 (Tex.App.—San Antonio 1987, no writ) (the three common-law marriage elements did not co-exist until parties purchased property, which established the element of holding out); *Gary v. Gary*, 490 S.W.2d 929, 934 (Tex.App.—Tyler 1973, writ ref'd n.r.e.).

### a. Agreement to be married

■ Winfield contends Renfro did not prove they agreed to be married. To establish this element, the evidence must show the parties intended to have a present, immediate, and permanent marital relationship and that they did in fact agree to be husband and wife. *Rodriguez v. Avalos*, 567 S.W.2d 85, 86 (Tex.App.—El Paso 1978, no writ).

### (1) Legal sufficiency

Winfield contends there is no evidence they agreed to be married.

■ Renfro asks us to consider the following evidence to support of the element that they agreed to be married: Renfro testified that after she became pregnant, Winfield and she agreed to be married informally in Dallas on April 11, 1982. She said she agreed to forego a ceremonial marriage because of Winfield's concerns about the effect of fathering a child before marriage would have upon his image with the media, his endorsement contracts, and the New York Yankees. Her testimony is direct evidence of the agreement to be married. *Collora v. Navarro*, 574 S.W.2d 65, 70 (Tex.1978) (direct testimony of the party of an agreement to be married was enough to raise the issue of agreement); *see also Giessel*, 734 S.W.2d at 32 (testimony of one party that they had agreed to be married "in God's eyes" was direct evidence of agreement to be married). Renfro's testimony is more than a scintilla of evidence that the two agreed to be married. *Collora*, 574 S.W.2d at 70; *see Bolash*, 733 S.W.2d at 699. Thus, on Renfro's testimony and the inferences we draw from it, we

hold evidence is sufficient to overrule a legal sufficiency challenge to the evidence to support the element of the agreement to be married. *Collora,* 574 S.W.2d at 70.

### (2) Factual sufficiency

■ Next, Winfield argues the evidence is factually insufficient to support the element that they agreed to be married. Under the factual sufficiency challenge we must consider all the evidence. *Cain,* 709 S.W.2d at 176.

Winfield asks us to consider the following evidence to challenge the element that they agreed to be married: Winfield testified he never had a present intention to be married to Renfro; he did not stay overnight at the hotel, but stayed with the team at another hotel; they did not have champagne; and he knew nothing about a "honeymoon" suit. Winfield's brother, an insurance agent, sold health insurance to Renfro in December of 1982 and Renfro's application for the policy, which she signed, stated that she was not married. Renfro filed her income tax statements as head of the household, not as a married woman. Renfro signed the birth certificate with the name of Renfro, not Winfield. Craig Comier, a friend of Renfro's, testified that Renfro told him in September 1982, after Shanel was born, that they planned to get married, but it had been postponed. Renfro made specific references to a future date for them to marry. Renfro identified her as Shanel Renfro, not Winfield.

Renfro asks us to consider the following evidence to support the element that they agreed to be married: Winfield purchased the condominium in the summer of 1982, and Renfro moved into the condominium in early August 1982. Renfro said that Winfield was "together" with her many times at the condominium in Houston. Winfield sent an oversized bed to the Houston home; Renfro testified that Winfield kept personal belongings at the home. Alma Renfro, Renfro's mother, testified that she went by

the Houston condominium frequently in the fall of 1982 and that David was there most of the time although he sometimes traveled for business reasons. Pat Caruso, Winfield's secretary, testified that she learned that Winfield was buying a condominium in Houston for his family; she further testified that from October 1982 to the end of 1984, Winfield spent about 100 days in Houston during the off season.

To explain, Winfield offers the following evidence: He bought the condominium as an investment, not as an indication of agreement to marry; he sent the bed to Houston because it was an extra bed; and neither Renfro nor Winfield wore a wedding ring.

■ Evidence of an agreement to be married may be inferred from cohabitation and representations. *Collora,* 574 S.W.2d at 70; *Giessel,* 734 S.W.2d at 32. Considering all of this evidence, we hold the evidence is sufficient to overrule a factual sufficiency challenge to the evidence to support the element of intent to be married. We overrule the point of error as it relates to the element of the agreement to be married.

### b. Lived together

■ Winfield contends Renfro did not prove they lived together as husband and wife in Texas on April 11, 1982, the date in the jury question. Although the three elements that make up a common-law marriage may occur at different times, until all three exist, there is no common-law marriage. *Bolash,* 733 S.W.2d at 699. To satisfy this element, the parties must live together in Texas. TEX.FAM.CODE ANN. § 1.91(a)(2). Living together in another state does not satisfy this element of common-law marriage. *Williams,* 722 S.W.2d at 788.

In this case, we are limited by the date in the jury question, which asked the jury to decide if the parties entered a common law marriage on or about April 11, 1982.[2] The

---

**2.** We note that in the *Texas Pattern Jury Charges,* the jury is asked to supply the date. 5 STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES PJC 201.04a (1989). Here, the date was supplied by the charge and thus it controls our review of the evidence as if it was the date determined by the jury.

phrase "on or about" means generally in time around the date specified. *Fortner v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,* 687 S.W.2d 8, 11 (Tex.App.—Dallas 1984, writ ref'd n.r.e.). This Court has upheld a variance of the date in the pleadings and proof of 19 days. *Snow v. Auto Loan Co.,* 259 S.W.2d 340, 342 (Tex.App.—Galveston 1953, no writ). Other courts have upheld variances in dates between pleadings and proof up to three months. *See Fortner,* 687 S.W.2d at 11 (variance of 40 days); *Aetna Casualty & Surety Co. v. Tucker,* 418 S.W.2d 382, 383 (Tex.App.—Beaumont 1967, writ ref'd n.r.e.) (variance of 23 days); *Ingram v. Gentry,* 205 S.W.2d 673, 675–76 (Tex.App.—Waco 1947, no writ) (variance of three months); *Kleber v. Pacific Avenue Garage,* 70 S.W.2d 812, 814 (Tex.App.—Dallas 1934, writ dism'd) (variance of three months); *Texas & N.O.R. Co. v. Weems,* 184 S.W. 1103, 1104 (Tex.App.—Texarkana 1916), *aff'd* 222 S.W. 972 (Tex. Civ.App.1920) (variance of 30 days).

■ The test in determining whether to uphold a variance between the pleadings and proof is whether the variance between the proof and the evidence was substantial, misleading, and prejudicial. *Brown v. American Transfer & Storage Co.,* 601 S.W.2d 931, 937 (Tex.1980); *Danny Darby Real Estate, Inc. v. Jacobs,* 760 S.W.2d 711, 718 (Tex.App.—Dallas 1988, writ denied); *Kleber,* 70 S.W.2d at 814.

Here, the date the parties entered a common-law marriage (if they did), is critical, for it not only fixes the date for the marriage, it establishes the size of the community estate. If the parties entered a common-law marriage in April 1982, it would result in a larger community estate than one establish later, say in 1987. Thus, on this charge, which will establishes both the date of the marriage and the size of the community estate, we limit Renfro to proving the elements of a common-law marriage as it might have existed up to August of 1982. Using a more generous definition than that used in the cases cited above, we examine the record to determine if in the four months after April 11, 1982, Renfro provided any evidence to support the element of living together as husband and wife.

### (1) Legal sufficiency

■ Winfield contends there is no evidence they lived together as husband and wife in Texas on or about April 11, 1982, the date in the jury question.

Renfro asks us to consider the following evidence to support the element of living together as husband and wife: Winfield and Renfro stayed in the hotel in Dallas for three days. In April of 1982, Winfield told her to look for a home for them in Houston; he specifically requested one with good security because of his reputation. Beginning in August 1982, when Renfro moved into the condominium, Renfro testified they lived together whenever Winfield was in Houston.

Undermining somewhat her claim that they lived together in Texas on or about April 11, 1982, Renfro admitted that after April 11, 1982, Winfield did not visit Houston again until August 1982. Thus, from April 11, 1982 to August 1982, the two did not occupy the same residence in Texas. Although Renfro traveled outside of Texas to visit Winfield during that period, we cannot consider that evidence to support the element of living together *in Texas.*

If we stretch "on or about" to include August (four months), we can consider Renfro's testimony that they lived together in Texas, beginning in August, to support the second element. The evidence outlined here is sufficient to overrule a legal sufficiency challenge to the evidence to support the element of living together as husband and wife. In *Bolash,* the court stated that "her testimony that they were together each time he came to this country is sufficient to support the element that they lived together as husband and wife to the extent possible under the circumstances." 733 S.W.2d at 699. Thus, on the testimony that beginning in August, Winfield lived with Renfro in Houston when he could, and the inferences we draw from it, we must overrule the legal sufficiency challenge to the verdict regarding the element of living together as husband and wife.

## (2) Factual sufficiency

■ Next, Winfield argues the evidence is factually insufficient to support the element they lived together as husband and wife. Under this challenge, we examine all the evidence to determine if the evidence was factually sufficient to support the element that Winfield and Renfro lived together as husband and wife.

Winfield asks us to consider the following evidence to challenge the element that they lived together as husband and wife: Winfield testified he did not live with Renfro, that he bought the condominium to take care of his daughter, not to marry her mother; he said he did not have a key to the condominium (Renfro said he did). Winfield sent Renfro fruit, flowers, and a card in September of 1982, that said "for *your* new home." (Emphasis ours.) Winfield said that over a period of five years, he stayed at the condominium in Houston for only 14 days (his secretary said in two years he spent about 100 days in Houston). Winfield and Renfro testified that Winfield continued to see other women during this time, and that Renfro knew about it. Renfro admitted she knew Winfield traveled with other women, and took a woman to Africa in November 1982.

Renfro asks us to re-consider the evidence that we considered under the factual challenge to the agreement to be married: He bought a condominium for her in August 1982; the two of them were together as often as he could be in Houston; he sent his bed to Houston; he kept his personal belongings here; he acted "husbandly," that is he did errands, worked around the house, and generally behaved as if he were married.

Considering all the evidence under the factual sufficiency point of error, we hold the evidence is sufficient to support the element of living together as husband and wife on or about April 11, 1982, and is not against the great weight and preponderance of the evidence.

### e. Holding out

Winfield contends that Renfro did not prove they represented to others in Texas, that they were husband and wife on or about April 11, 1982. To satisfy this element, the parties must represent in Texas that they are married. TEX.FAM.CODE ANN. § 1.91(a)(2). Representing to others in another state that they are married does not satisfy this element of common-law marriage. *Williams,* 722 S.W.2d at 788. Recall that this element must occur concurrently with the agreement to be married and the element of living together as man and wife. Until the three elements coexist, there is no common-law marriage. *Bolash,* 733 S.W.2d at 699. Because the jury question asks only if the elements existed on or about April 11, 1982, we are limited to considering evidence around that date, that is, including August 1982.

■ The statutory requirement of "represented to others" is synonymous with the judicial requirement of "holding out to the public." *Giessel,* 734 S.W.2d at 30. It is well settled that "holding out" may be established by conduct and actions of the parties. *Giessel,* 734 S.W.2d at 31; *Rosales v. Rosales,* 377 S.W.2d 661, 664 (Tex.App.—Corpus Christi 1964, no writ). Spoken words are not necessary to establish representation as husband and wife. *Associated Indem. Corp. v. Billberg,* 172 S.W.2d 157, 164 (Tex.App.—Amarillo 1943, no writ).

### (1) Legal sufficiency

■ Winfield contends there is no evidence they held themselves out to be husband and wife in Texas on or about April 11, 1982, the date in the jury question.

Renfro asks us to consider the following evidence to support of the element of holding out as husband and wife in Texas: Renfro reserved a suite at the Amfac Hotel at the Dallas airport as "Mr. and Mrs. David Winfield." Following the trip to Dallas, she testified she told her mother that she and Winfield were married. Alma Renfro testified that she knew they had a common-law marriage because Sandra had told her.

The registration form indicates Renfro made the reservation in her own name for a Mr. and Mrs. Winfield:

M/M David Winfield
Attn: S. Renfro
4511 Orange St
Houston, TX 77020

Renfro testified that Winfield paid for the room in cash and took the receipt when they checked out of the hotel.

The only other evidence Renfro offers of holding out is that the mailbox at the condominium had the name Winfield on it, and Winfield knew and did not object. This was in August or September of 1982. Renfro argues that Winfield acquiesced in being identified as married to Renfro.[3]

On the narrow issue of holding out in Texas on or about April 11, 1982, we find there is more than a scintilla to support the jury's answer. Thus, on this testimony and the inferences we draw from it, we must overrule the legal sufficiency challenge to the verdict regarding the element of representing to others in Texas that they were married.

### (2) Factual sufficiency

■ Next, Winfield argues the evidence is factually insufficient to support the element of "holding out." Under this challenge, we must consider all evidence to determine if the evidence is factually sufficient.

Winfield asks us to consider the following evidence to challenge the element of holding out as husband and wife: Renfro represented that she was single in her tax

returns, bank and pay records, and in her insurance applications. She signed her daughter's birth certificate in the name Renfro and gave her daughter the name Renfro, not Winfield. Renfro testified she did not use the name Winfield because Winfield told her not to. Sometime in 1982, early in the baseball season, when Renfro was pregnant, Renfro traveled to Florida to meet Winfield. When Renfro brought up the issue of getting married to Winfield in the presence of Al Forman, Winfield's manager, she was told Winfield was not getting married. When Renfro attended Yankee games, she and Sharad did not sit in the section for the team's family; Winfield asked them to sit in right field. Although Winfield bought the condominium, he testified their agreement was that Renfro would begin paying rent in two years, after she started working. The condominium was an investment and according to his agreement with Renfro, she could live there rent-free for two years because she found the house. In 1984, they talked about her paying him rent. Winfield began dating Tonya Winfield in 1981 and continued dating her, with one interruption, until they married in 1988. Winfield and several other witnesses testified that he never introduced Renfro to anyone as Mrs. Winfield. Winfield testified that when he traveled with Renfro before and after April 11, 1982, they always logged in under their separate names, not as Mr. and Mrs. Winfield.

Tonya Winfield testified that Winfield told her he was not married to Renfro. In

---

**3.** Renfro asks us to consider other evidence about events in 1983 and 1987. Because the evidence is too removed from the date in the charge, we decline. That testimony is: In 1983, while Winfield and Renfro were vacationing in the Bahamas, a local newspaper described them as Mr. and Mrs. Winfield. The witness Sarah English, Renfro's neighbor, testified that in the fall of 1983, she gave a party honoring Renfro and Winfield. She referred to the couple as David and Sandra Winfield on the invitations and introduced them that way at the party. English testified that Winfield heard the introductions, and that he did not deny or correct it. This testimony might support a holding out in late 1983, but does not support a holding out in April 1982. Even then, an isolated reference as

husband and wife is no evidence of "holding out." *Threet*, 333 S.W.2d at 364; *Giessel*, 734 S.W.2d at 31. The second witness, Pat Caruso, Winfield's former secretary, testified she asked Winfield in November 1983, if he was married to Renfro. Instead of answering, Winfield just smiled. Caruso testified that she understood his smile to mean he was married to Renfro. No legal theory would permit us to uphold the verdict based on her interpretation of a smile, even if it happened in April 1982. The third witness, Marsha Dewan, school teacher to Sharad, Renfro's other child, testified that in April of 1987, Winfield introduced himself to her as Sharad's stepfather. Again, her testimony might support a holding out in 1987, but not in 1982.

April 1983, when Tonya was traveling with Winfield, she picked up the telephone in their hotel room when Renfro called. She testified Renfro claimed to be Winfield's "lady," meaning girlfriend, not his wife. Renfro then asked Tonya if she was planning to marry Winfield.[4] Even Renfro's mother admitted that Winfield never introduced Renfro as his wife.

Renfro asks us to consider the following evidence to support the element of holding out in Texas: When Renfro moved into the condominium, the condominium's mailbox had the name Winfield on it. It was later taken down.[5]

In none of the documents in which Renfro was required to state her marital status, did Renfro state that she was married. When Renfro contracted with Winfield's brother for insurance, she signed a form that said she was single. This was a representation, not to a stranger, but to a member of Winfield's family, a person who would normally know if the couple was holding themselves out as a married couple. There was no evidence as to any reason to misinform the brother or the insurance company about her status, if she was holding herself out as married to Winfield. When Renfro signed her daughter's birth certificate, she used the name Renfro, not Winfield. When Renfro filed her tax return, she indicated she was a single person. The federal government might have a keen interest in Renfro's status as the wife of a well-paid sports star.

We recognize that in *Giessel*, we affirmed a common-law marriage even though the wife had filed income tax returns as a single woman. *Giessel*, 734 S.W.2d at 31. In *Giessel*, however, the couple had lived together as husband and

wife for 20 years. If the record here were replete with other evidence that showed a common-law marriage, the evidence of the tax return and the insurance application would be less significant.

Even by Renfro's testimony, the marriage was largely a secret marriage. If secret, it was not a common-law marriage. *Threet*, 333 S.W.2d at 364. A common-law marriage is more than a contract; it is a public status. *Id.* Here, the marriage seems to have been a secret from everyone except Renfro's relatives and acquaintances. Renfro testified she only told her mother she was married, and she only used the name Winfield around her neighbors and when she traveled with Winfield. To resolve this issue, we must compare the supreme court's decision in *Threet* to our decision in *Giessel*. Both *Threet* and *Giessel* involve an element of secret marriage and an occasional introduction as husband and wife. In *Threet*, the supreme court held that a common-law marriage was not established even though the couple had been introduced as husband and wife, because the couple's cohabitation occurred in secret at their parents' houses, and only a few friends were told of the marriage. *Threet*, 333 S.W.2d at 364. In *Giessel*, this Court held that even though the couple did not tell some of their relatives that they were married, and even though the wife listed herself as single on her tax returns, the couple formed a common-law marriage because the couple cohabited for 20 years, the man represented to many other persons in the community that the woman was his wife, and the couple had the reputation in the community for being married. *Giessel*, 734 S.W.2d at 31.

---

**4.** Renfro, as the dissent points out, contradicts the evidence about this telephone call. Renfro claims she told Tonya she was married to Winfield. The dissent says we "evidently" place no significance on Renfro's testimony about the conversation with Tonya Turner. Not so. We do place some significance on it and we acknowledge it supports Renfro's testimony that in 1983 (not 1982) she (not Winfield) held herself out as married. But, Renfro's version of the conversation is no evidence that Winfield held himself out as married in 1982. That is

what this record is lacking: evidence that Winfield held himself out as married to Renfro.

**5.** Renfro also asks us to consider the testimony of a witness about events in 1983 and 1987. Because their testimony is too removed from the date in the charge, we decline. One witness testified that in the fall of 1983, Renfro's neighbors had a party for her and Winfield and they introduced as Mr. and Mrs. Winfield. Winfield did not correct the introduction.

Under these two cases, it is clear that a marriage that is secret from some persons can still be a common-law marriage. In *Threet*, the supreme court held a marriage that was secret from most of the people in the community—only a few friends knew about it—was not a common-law marriage. In *Giessel*, we held that a marriage that was secret from only a few members of the couple's family, was a common-law marriage because the marriage was widely known in the community. Here, only a few people knew about the marriage: Renfro's mother testified her daughter told her they were married; English said she thought they were married; Whitfield said she considered them married by their conduct. A schoolteacher said Winfield told her he was the stepfather to Renfro's other child, and that someone at the school told her that Winfield was Renfro's husband.

 *Threet* and *Giessel* establish that occasional introductions as husband and wife do not establish the element of holding out. In *Threet*, the couple was introduced as husband and wife to a few friends, and the supreme court held the occasional introduction amounted to no evidence of holding out. *Threet*, 333 S.W.2d at 365. In *Giessel*, the couple had the reputation in the community for being married. *Giessel*, 734 S.W.2d at 31. Here, as in *Threet*, the couple was introduced as husband and wife on only two occasions; as opposed to *Giessel*, the couple did not have the reputation in the community for being married.

 We note that the dissent argues the evidence was very contradictory on the issue of holding out. We believe the problem was that the evidence of holding out *in Texas* around *April 11, 1982* was scant, not contradictory. Most of the evidence urged by the dissent to support "holding out" happened long after April 11, 1982, the date in the jury charge. The only evidence the dissent can find to support its position on holding out as married close to April 11, 1982 is that Renfro and Winfield stayed in a hotel in Dallas around that time and, on her return to Houston, she told her mother that she was married. Our response is that a three-day stay in a hotel with a person of the opposite sex is not enough to establish the element of holding out as married.

All other evidence offered by the dissent to support holding out in 1982, 1983, and even later, was holding out by Renfro only, not by Winfield. Only Renfro did anything, and she did not do much, that could be interpreted as holding them out as married in 1982 and in 1983. Winfield did not tell anyone he was married and nothing in the record contradicts him on this point, not even Renfro. During this period he was seeing other women and traveling with them openly. Renfro knew because Winfield told her he was having sexual relations with other women. Even her unilateral testimony on holding out is not without contradictions. In April 1982, Renfro visited Winfield in New Jersey for the housewarming party there. Winfield introduced her as the hostess, not as his wife.

If the jury had been asked (1) if they were married, and if so (2) on what date, the jury might have found they were married in 1983 or sometime later. But, on this record, the evidence that they were married (that they held themselves out as married) on April 11, 1982 is against the great weight and sufficiency of the evidence. The dissent's analysis would adopt a form of relation-back: any evidence of Winfield's "holding out," no matter when it occurred, would relate back to corroborate Renfro's allegations that they held themselves out to be married in 1982.

Considering all the evidence under the factual sufficiency point of error, we hold the evidence was insufficient to support the element that Renfro and Winfield represented to others that they were married on or about April 11, 1982. We overrule point of error two as it relates to the legal sufficiency challenge, and we sustain it as it relates to the factual sufficiency challenge on the element of representing to others in Texas that they were married. Based on this holding, we reverse and remand for new trial.

### 3. TEMPORARY ORDERS AND SECOND TRIAL

In point of error three, Winfield contends that the trial court abused its discretion in entering temporary orders and conducting a second trial on the issues of divorce, conservatorship, and child support after the first judgment was entered in this case. Specifically, Winfield contends that the July 10 "Interlocutory Order of Common Law Marriage" is a final judgment.

The arguments Winfield presents in his third point of error have previously been addressed by this Court in *Winfield v. Daggett*, 775 S.W.2d 431, 433 (Tex.App.—Houston [1st Dist.] 1989, no writ). This Court found that the July 10 order was not a final judgment. This decision was based on (1) the pretrial hearing where the trial court ordered that the common-law marriage issue be tried separately; (2) the temporary orders signed July 14; and (3) the fact that the July 10 order does not expressly or impliedly dispose of the issues of divorce, conservatorship, or the tort claims. *Id.* at 434.

Point of error three is overruled.

### 4. TRIAL BY JURY

In point of error five, Winfield contends that the trial court erred in denying Winfield a trial by jury.

#### a. Refusal to submit characterization issues

■ Winfield asserts that the trial court improperly refused to submit property characterization issues to the jury. In his pleadings, Winfield claimed all of his assets as separate property. He bases this claim on the fact there was no marriage between the parties. Second, he claimed that even if a marriage was established, his assets were still separate property because he is domiciled in New Jersey.

On retrial, if the court reaches the issue of characterization of property, if the evidence raises fact questions about the characterization of the property, and if Winfield submits jury questions in the proper form, the trial court should submit those issues to the jury.

#### b. Separate trials

■ Winfield also asserts that the trial court denied him a trial by jury by conducting separate jury trials on the issues of marriage and divorce.

Rule 174(b) of the Texas Rules of Civil Procedure permits a trial court to order separate trials of any claim or issues in "furtherance of convenience or to avoid prejudice." Separate trials of on the issue of marriage and the issue of property is recommended in the *Texas Pattern Jury Charges. See* 5 STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES PJC 201.04 Comment, p. 201–9 (1989). The decision to grant separate trials will not be disturbed on appeal absent an abuse of discretion. *Van Dyke v. Boswell, O'Toole, Davis & Pickering*, 697 S.W.2d 381, 384 (Tex.1985).

Here, Renfro's suit for divorce alleged that a common-law marriage existed between the parties. Winfield denied that any marriage existed. Thus, the suit involved not only whether the parties were married, but also involved divorce and the division of significant property. Because the determination of the marriage issue had the potential to dispose of the divorce and property questions, the trial court did not abuse its discretion in ordering separate trials.

Moreover, the separate trials did not deprive Winfield of his right to a jury trial. The Texas Constitution provides that the right to a jury trial is not an absolute right, but is subject to certain procedural rules. *Barclay v. Ochiltree Appraisal Dist. Bd.*, 730 S.W.2d 878, 880 (Tex.App.—Amarillo 1987, no writ). One such procedural rule is 174(b) of the Texas Rules of Civil Procedure, which allows for a separate trial of issues before different juries if the issues are distinct and separable. *See, e.g., Shelton v. Belknap*, 155 Tex. 37, 282 S.W.2d 682 (1955) (issue of common-law marriage tried first where common law wife brought suit for damages for wrongful death of her common-law husband). Clearly, the issues of marriage and divorce are distinct and separate issues. Thus, the separate trial

on these issues did not deprive Winfield of his right to a jury trial.

We overrule point of error five.

## 5. OTHER ISSUES

In point of error four, Winfield contends that the trial court erred in awarding a judgment for owelty and recoupment. In point of error six, Winfield asserts that the trial court erred in applying section 3.63(b) of the Texas Family Code in dividing the estate of the parties because he is a resident and domiciliary of New Jersey. In point of error seven, Winfield contends that the evidence was legally and factually insufficient to support the jury's verdict of $1,151,067.00 on the valuation of the Tymark stock. In point of error eight, Winfield argues that the trial court erred in awarding excessive child support, separate maintenance, and attorney's fees. Because we reverse and remand on the issue of common-law marriage, there is no need to address points of error four, six, seven, and eight because they depend on the existence of a marriage. A valid marriage is a prerequisite to a support order an action for divorce. *Threet*, 333 S.W.2d at 363.

The judgment of the trial court is reversed and remanded.

MIRABAL, J., dissents and files an opinion.

MIRABAL, Justice, dissenting.

I respectfully dissent.

I agree with the majority that to establish the existence of a common-law marriage, the evidence must show *all three* of the following elements existed *as of the same point in time:*

1. the parties agreed to be married;
2. after the agreement, they lived together in Texas as husband and wife; and
3. they represented to others in Texas that they were married.

I also agree that the key date in this case is April 11, 1982. The jury found that a common-law marriage existed between the parties "on or about April 11, 1982". Therefore, in addressing point of error two,

which attacks the legal and factual sufficiency of the evidence to support the jury's finding, we must determine whether reasonable people could have concluded, from a preponderance of the evidence, that on or about April 11, 1982, Winfield and Renfro had (1) agreed to be married, (2) lived together as husband and wife in Texas, and (3) represented to others that they were married.

I agree with the majority's analysis and conclusions under point of error two, to the extent the majority finds:

1. · the evidence is *legally* and *factually* sufficient to support the jury's finding that on or about April 11, 1982, Winfield and Renfro *agreed to be married;*

2. the evidence is *legally* and *factually* sufficient to support the jury's finding that on or about April 11, 1982, Winfield and Renfro *lived together in Texas as husband and wife;* and

3. the evidence is *legally* sufficient to support the jury's finding that on or about April 11, 1982, Winfield and Renfro *represented to others that they were married.*

However, I disagree with the majority's conclusion, under point of error two, that the evidence is *factually insufficient* to support the jury's finding that on or about April 11, 1982, Winfield and Renfro *represented to others that they were married.*

The evidence before the jury was very contradictory. Winfield's testimony about many matters was exactly the opposite. of Renfro's testimony about the same matters. The jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Rego Co. v. Brannon*, 682 S.W.2d 677, 680 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). This Court may not substitute its opinion for that of the jury merely because we would have reached a different result. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 634 (Tex.1986). It is obvious from the jury findings that the jury believed Renfro's version of the facts in the instances when Renfro's version directly contradicted Win-

field's version. This was the jury's prerogative.

The following is a summary of evidence I believe is relevant to the question whether, on or about April 11, 1982, Winfield and Renfro represented to others that they were married. This summary includes evidence of activities occurring before and after April 11, 1982, as well as evidence of activities occurring outside the state of Texas, to the extent the jury may have reasonably considered the evidence as corroborating and relevant to the question of the parties' relationship on or about April 11, 1982. The summary reflects Renfro's version of the facts, in those instances where her testimony and Winfield's testimony contradict.

Sandra met David [1] in 1973 when she was eighteen years old. In 1973, David was playing baseball for the San Diego Padres and Sandra was a student at Texas Southern University. Over the next several years, Sandra and David became friends and saw one another whenever David came to Houston to play ball. By 1975 or 1976, the couple commenced an intimate relationship; the relationship later ended. From 1979 to 1981, Sandra was married to Ira Terrell, the father of her son, Sharad Terrell. Sharad was born January 14, 1979.

Sandra and David began to see each other again in 1981. On a trip to South America in January 1982, Sandra became pregnant with Shanel. Sandra testified that upon discovering she was pregnant, Sandra and David discussed marriage. David told Sandra that he had concerns over his image if it was discovered he had fathered a child prior to marriage. However, David wanted to make sure they would be married, so that the baby would be legitimate; this was important to him because of the Winfield Foundation for Children.

In early April 1982, David told Sandra he wanted to have an informal marriage ceremony between themselves, rather than a ceremonial marriage; he wanted her to meet him in Dallas on April 11, 1982. About April 10, during a telephone conversation, David told Sandra to make the following arrangements: get a nice car, preferably a Mercedes, and make a reservation at a nice hotel for a suite. Sandra made the reservation at the Amfac Hotel in Dallas. She told the people she wanted a honeymoon suite under "Mr. & Mrs. David Winfield." They did get a honeymoon suite. Sandra received a confirmation of the reservation on April 11, 1982, which said the reservation had been made in the name:

M/M David Winfield
Attn: S. Renfro
4511 Orange Street
Houston, Tx 77020

David and Sandra stayed at the Amfac Hotel for three days. The hotel brought champagne, roses, and fruit to the suite daily. When they checked out of the hotel, David paid the bill and took the receipt.

Sandra testified that the following week she told her mother, who lived in Houston, that she and David were married in Dallas. Alma Renfro testified that she knew they had a common-law marriage because Sandra had told her so.

In latter April 1982, David told Sandra to find a place for them to live. Pat Caruso, David's secretary in New Jersey, testified she heard David say he was buying a condominium in Houston for himself, Sandra, and his family. In the summer of 1982, David purchased the condo in Houston where Sandra and her son Sharad lived. After Sandra gave birth to David's daughter, Shanel, in September 1982, Sandra and both children lived in the condo. The mailbox at the condo had the name "Winfield" on it. According to David's secretary, from October 1982 to the end of 1984, David spent about 100 days in Houston during the off season, and she could reach him at the condo.

In addition to paying for the condo, David paid for the furnishings and the upkeep of the home; he paid for food and clothing for Sandra and the children; he

1. In this summary of the evidence, I refer to the parties by their first names.

paid their medical and dental expenses; and he paid their travel expenses. David acknowledged that, although he has had relationships with other women, he has never supported them, and has not paid their rent or mortgage.

Alma Renfro, Sandra's mother, testified that she went by the Houston condominium frequently in the fall of 1982, and that David was there most of the time, although he sometimes traveled for business reasons. She described David's actions as "husbandly," that he did errands, worked around the house, and generally behaved as if he were married.

During the 1982 Christmas holidays, Sandra and the children flew to Minnesota to be with David's family. Sandra testified that David referred to Sharad (Sandra's son from her prior marriage) as David's stepson. David's mother called Sharad her "grandson," and referred to herself as Sharad's "grandma." In 1984, David's mother had a portrait of both Shanel and Sharad hanging over the sofa in her living room. On Sharad's sixth birthday, David sent the following message to Sharad: "Happy sixth Birthday, Sharad, love Daddy."

Sarah English, a neighbor, testified she thought David and Sandra were married. In January 1983, when she moved into her condo, English was told by the condo complex that David and Sandra were married. In the fall of 1983, English gave a party honoring Sandra and David. There were 30 to 35 people at the party. English referred to the couple as David and Sandra Winfield on the invitations, and introduced them that way at the party. English testified that David heard the introductions, and that he did not deny or correct the way she introduced them.

In January 1983, Sandra was with David in New Jersey when he was presented with the Sports Writers Association's Golden Globe award. In July 1983, Sandra was with David in Chicago when he played on the All–Star team; David gave his All–Star watch to Sandra. In January 1984, Sandra was with David in Oklahoma when he was presented with the Jaycee's award for being one of the Ten Most Outstanding Men in America.

Tonya Turner, who David married during the pendency of this proceeding in the trial court, testified that in the spring of 1983 she was traveling with David and she answered the telephone at the hotel when Sandra called. Tonya testified Sandra claimed to be David's "lady," meaning his girlfriend, not his wife. According to Tonya, Sandra asked Tonya if *she* was planning to marry David. However, according to Sandra, when she called the hotel room, and Tonya answered, Sandra told Tonya that she (Sandra) and David were married, and that the only thing they didn't have was a piece of paper.

Jerome Armbrister, a sports reporter, testified he first met David and Sandra in November 1983, at a softball game in the Bahamas. Armbrister was covering the game. It was announced that David Winfield and his wife were attending the game. Approximately 50 to 60 people were in the stadium when the announcement was made. The game was also broadcast on the radio. After the announcement, Armbrister introduced himself to Winfield as "Jerome Armbrister, from the Nassau Guardian, the local newspaper." Winfield responded with "nice to meet you, this is my wife, Sandra." The Nassau Guardian photographer took a photo of David and Sandra while Armbrister interviewed David. The picture of David and Sandra, and the article written by Armbrister, were introduced into evidence. David told Sandra to take the paper home with her. She showed the newspaper to her mother and a few friends when she got back to Houston. David did not deny the statements to any of the people in Houston. Armbrister said David never requested a retraction of the statements made by Armbrister in the article.

Pat Caruso testified that David received a letter from some people in the Bahamas thanking David and his wife for being there. Caruso then asked David if he was married, and David smiled in response. Caruso understood his smile to indicate he was married to Sandra.

Craig Cormier, Billie Whitfield, and Patricia Henderson, all friends of Sandra, testified that although David and Sandra never actually said they were married, all three thought David and Sandra were married based on their conduct.

Testimony contrary to the jury's findings included that when Sandra filed her income tax returns, she filed as a head of household, not as married. However, the jury also heard Sandra's explanation that she filed her tax returns this way because David told her to, and he paid her taxes for 1982 and 1983.

Additionally, on December 22, 1982, Sandra met with David's brother, an insurance agent, and signed an application for health insurance covering Sandra and Shanel; the box next to "married" was checked "no" by Sandra. David had spoken to his brother about the insurance, and David paid for the insurance.

Other testimony contrary to the jury's findings included testimony David and Sandra never sent each other anniversary cards; Sandra did not wear a wedding ring from David; David signed Shanel's birth certificate but, at David's instructions, Sandra signed Shanel's birth certificate as "Sandra Renfro," and named Shanel "Shanel Renfro"; Sandra and David signed a management agreement on December 26, 1982 for the redecorating and refurnishing of the condo by Sandra, as an interior decorator; a number of witnesses testified Sandra spoke to them of a future date for a marriage ceremony, but the wedding never took place. David testified he spent a total of only 14 days at the condo since September 1982; Sandra was to pay him rent for the condo, although she never had; he never had a key to the condo; he never agreed to be married; he didn't recall being in the Amfac Hotel in April 1982; he didn't stay at the Amfac, he stayed with the team; he didn't recall any champagne; he never told Sandra he wanted to get married after she became pregnant; when he got back to New York from the Bahamas, he tried to call the Bahamas Newspaper to get the article retracted and corrected to say they were not married.

In my opinion, considering the jury's right to weigh the evidence and to disregard evidence it does not believe, there is ample evidence to support the jury's conclusion that David and Sandra, by both active and passive conduct, represented to others that they were married. The testimony dealing with their relationship in the latter part of 1982, 1983, and 1984 lends credibility to Sandra's position that they entered into a common-law marriage "on or about April 11, 1982." In my opinion, from the evidence, the jury could reasonably have concluded that David knew a honeymoon suite would be reserved in the name "Mr. and Mrs. Winfield," since Sandra made the reservations that way after David told her they would have an informal marriage ceremony between themselves at the hotel. From the testimony that David and Sandra stayed in the honeymoon suite for three days, and that the hotel provided complimentary champagne and flowers daily, the jury could reasonably have concluded that David at least acquiesced in their "holding out" that they were married. Sandra, within a week, told her mother she and David were married. Later that same month, David instructed Sandra to look for a condo with good security. That summer, David purchased the condo for Sandra and the children, and the mailbox had the name "Winfield" on it.

I conclude that this evidence, when viewed in light of the corroborating evidence dealing with their prior and subsequent conduct, is factually sufficient to support the jury's finding that the parties, on or about April 11, 1982, represented to others that they were married. I would overrule point of error two.

Additionally, I disagree with the majority's decision to sustain point of error one.

I agree with the majority that it was error to omit the word "there" or "in Texas" from the jury question; however, in my opinion, the error was harmless.

The defect in the jury question is that the jury was not told that one of the elements of a common-law marriage is that the parties must represent to others *in Texas* that they are married. However, the

jury was specifically instructed, by the very wording of the question, that in order to answer "yes," they had to find David and Sandra entered into an informal or common-law marriage "on or about April 11, 1982." The only evidence of a "holding out" on or about April 11, 1982, involved activity *in Texas.*

Sandra, acting in accordance with David's instructions, reserved a honeymoon suite in their married name; they stayed in the honeymoon suite for three days, accepting champagne and flowers, compliments of the hotel; the following week, Sandra told her mother they were married; that same month, David told Sandra to find a place to live in Houston with good security, and she began the search; a few months later, that summer, David bought the condo for Sandra, himself, and the family; "Winfield" was on the mail box; David paid all the family's living expenses incurred in Texas.

All of the evidence dealing with conduct occurring outside of Texas relates to a time period far removed from April 11, 1982. Although the out-of-state evidence may have *corroborated* the marriage, the out-of-state conduct could not, alone, support a finding of marriage "on or about April 11, 1982." Again, the *only* evidence of a holding out on or about that date dealt with conduct *in Texas.*

Error in the jury charge is reversible only if it caused, or was reasonably calculated to cause and probably did cause, the rendition of an improper judgment. *Island Recreational Dev. Corp. v. Republic of Texas Sav. Ass'n,* 710 S.W.2d 551, 555 (Tex.1986); *Trevino v. Brookhill Capitol Resources, Inc.,* 782 S.W.2d 279, 283 (Tex. App.—Houston [1st Dist.] 1989, writ denied); TEX.R.APP.P. 81(b)(1). For the reasons stated, in my opinion, the error in the jury charge, in all probability, did not cause the rendition of an improper judgment.

I would overrule point of error one.

In light of the fact that this is a dissenting opinion, it makes no difference to the outcome of this case whether I would sustain or overrule the remaining points of error. Therefore, I decline to address them.

## OPINION ON MOTION FOR REHEARING

 On motion for rehearing, David Winfield argues that, once we sustained point one, we were required to render judgment in his favor, not remand for retrial. Winfield contends when a cause of action is submitted to the jury with a missing element, and the party who did not have the burden objects that the element is missing, the trial judge may not deem the issue found in favor of the judgment. We agree. *Petroleum Anchor Equipment, Inc. v. Tyra,* 419 S.W.2d 829, 834 (Tex.1967). Winfield goes on to argue that when a disputed and essential issue is omitted over the objection of a party, the appellate court must find that the party waived that element and by so doing did not meet the burden placed on him by law. Again, we agree. *Glendon Invest., Inc. v. Brooks,* 748 S.W.2d 465, 468 (Tex.App.—Houston [1st Dist.] 1988, writ denied); *Dittberner v. Bell,* 558 S.W.2d 527, 534 (Tex.App.— Amarillo 1977, writ ref'd n.r.e.). Winfield claims that when an issue is submitted with a missing element, and the party who did not have the burden of proof objects, the appellate court must reverse and render, not reverse and remand for new trial. Once again, we agree. *Physicians and Surgeons Gen. Hosp. v. Koblizek,* 752 S.W.2d 657, 660 (Tex.App.—Corpus Christi 1988, writ denied); *Cameron County v. Velasquez,* 668 S.W.2d 776, 781 (Tex. App.—Corpus Christi 1984, writ ref'd n.r.e.); *see also Walker v. Comdata Network,* Inc., 730 S.W.2d 769, 771 (Tex.App.— Dallas 1987, writ granted). Winfield claims that "in Texas" was a missing and disputed element that cannot be deemed against him, and on which we must render judgment for him. On this, we do not agree.

We hold that the omission of the phrase "in Texas" was not the omission of an entire element. The entire element was that the parties represented to others *in Texas* that they were married. We hold that the element was submitted, albeit in a

defective condition. The cases cited by Winfield do not hold that when a party objects to a defective element (as opposed to a missing element), we must render. In each of the cases, an essential element was omitted; here, an essential element was merely defective.

In *Koblizek*, a premise liability case, the plaintiff did not request an issue asking if the floor presented an unreasonable risk of harm. *Koblizek*, 752 S.W.2d at 659. In Glendon Investments, a suit to establish the liability of an undisclosed agent, the plaintiff did not request an issue asking if the agent failed to disclose his agency. This Court said no other issue was sufficient to constitute a submission of disclosure. Glendon Investments, 748 S.W.2d at 467. In *Walker*, a suit for fraud, the plaintiff did not request an issue asking if the officers of the corporation knew at the time they made their representations that those representation were false. *Walker*, 730 S.W.2d at 771. In *Velasquez*, a personal injury suit for damages under Texas Tort Claims Act,[1] the plaintiff did not submit an element asking if the County owned the land on which the injury occurred. *Velasquez*, 668 S.W.2d at 781. In *Dittberner*, a suit on a note, the plaintiff did not submit an issue on defendant's knowledge of the falsity of his representation. *Dittberner*, 558 S.W.2d at 534.

None of the cases cited by Winfield supports his conclusion that a defective question which was submitted over an objection, requires that we render of judgment in his favor.

We overrule Winfield's motion for rehearing.

---

**1.** Tex.Prac. & Rem.Code § 101.002 (Vernon Supp. 1986)