**James Lambie RUSSELL, Appellant,**

v.

**Margaret Ann RUSSELL, Appellee.**

**No. 09–91–099 CV.**

Court of Appeals of Texas, Beaumont.

Oct. 1, 1992.

Rehearing Denied Oct. 29, 1992.

---

Louis Dugas, Jr., Orange, for appellant.

James Sparks, Jr. and Jack Lawrence, Beaumont, for appellee.

Before WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

## OPINION

WALKER, Chief Justice.

Appellant tells us that, "This is a case involving man and woman." Actually and factually this is a case involving a man, seven women, eleven children, two continents, perhaps only one ceremonial marriage, questions of informal marriage and according to appellant's brief, "more twists and turns than a mystery novel." Perhaps more succinctly stated this case is a trial judge's nightmare, which now, is before this Court for interpretation.

Our story begins somewhere in Great Britain, perhaps Scotland. Whether it was a dark and rainy night, the record speaketh not.

Our review begins with appellee's attorney questioning appellant:

Q. Dr. Russell, would you please state your name, sir?

A. James Lambie Russell.

Q. Dr. Russell, we have heard a great deal of testimony from Mrs. Russell about 1964. And without going through each and every city and year, did you meet Mrs. Russell in approximately 1962 or '63, approximately?

A. Yes.

Q. Was that in the state of New York?

A. Yes.

Q. Was your oldest son, James, born in the state of New York?

A. Excuse me, I'm having some trouble speaking, Your Honor, my throat—

Q. Was your oldest son, James, born in the state of New York?

A. No, oldest son was born in Scotland.

Q. I'm not talking about those children of that relationship, Doctor, the relationship with Margaret Kish that started in the state of New York?

A. Yeah.

Q. How many children were born of that relationship?

A. Five.

. . . . .

Q. Okay. Now, it is my understanding from what all your attorney has solicited from my client that you have never ever married any of these women?

A. That's in here. I'm not sure in Britain.

THE COURT: I didn't understand that.

MR. MATHENY: He was not sure whether he was married in Britain or not.

Q. (By Mr. Sparks) So you might have been married?

MR. MATHENY: May still be.

Q. (By Mr. Sparks) To another woman in Britain and—

A. It's possible.

Upon leaving Scotland appellant journeyed to America, the state of New York to wit, where he first met appellee in 1962. In 1964 the first of five children was born to appellant and appellee's relationship. Without tracing each of appellant's moves upon leaving New York state suffice it to say that when appellant would move, appellee would move with obvious cohabitation.

Even though, from 1962 to the time of appellee's filing her petition for divorce, appellant and appellee had a very close cohabital and holding out relationship, ap-

pellant also had other interests, with other women, who bore other children, which appellant biologically fathered. The statement of facts before us is rather hodgepodged, giving neither us nor the trial court much insight. We can discern that; appellant was listed as "husband" on a Certificate of Death of one Vawn Hall Russell in 1965; that appellant was sued for divorce by one Sarah Corbin after fathering two of her children; that allegedly appellant defended the Corbin suit for divorce by positing that he could not be married to Corbin because he was married to Margaret, appellee herein.

On February 28, 1991, the Honorable James M. Farris signed a thirty-two (32) page Decree of Divorce. Judge Farris, sitting without a jury, affirmatively found that there was an informal marriage between petitioner, appellee herein, and respondent, appellant herein, with an inception date of March 22, 1972. The trial court determined that appellant, in open court in a prior divorce proceeding filed against him by Sarah Corbin, defended that action by denying that he could be married to Sarah Corbin because he was married to appellee. The trial court held appellant's declaration, that he could not be married to Sarah Corbin because he was married to appellee, amounted to a judicial admission. Appellant says that such a finding was arbitrary and without supportive evidence.

In 1981, appellant believing death to be imminent, decided that a ceremonial marriage was in order. Appellant stated his reason as, "Like I said, I was going to die and I wanted to have the Social Security given to the children." Thus on July 1, 1981 appellant and appellee were ceremonially united in wedlock. The record is unclear as to which of appellant's eleven children were preferred for Social Security. We mention this only because the record represents that appellant was a generous biological Dad to all of his eleven children.

Appellee's brief mis-statingly represents that no findings of fact or conclusions of law were requested of the trial court in this nonjuried proceeding. Appellant's counsel actually filed two such requests but neither was pursued in conformity with Tex. R.Civ.P. 296.

"In a nonjury trial, where no findings of fact or conclusions of law are filed or requested, it is implied that the trial court made all the necessary findings to support its judgment. [citations omitted] When a statement of facts is brought forward, these implied findings may be challenged by factual sufficiency and legal sufficiency points the same as jury findings or a trial court's findings of fact." *Roberson v. Robinson,* 768 S.W.2d 280, 281 (Tex.1989).

Prior to addressing appellant's four points of error we must attend to the proposition of both appellant and appellee that the case before us is one of first impression in Texas calling for an interpretation of TEX.FAM.CODE ANN. § 1.91(b) (Vernon Supp. 1992), as amended, effective September 1, 1989. We believe it helpful to set forth § 1.91 TEX.FAM.CODE ANN. in its entirety which is titled, *"Proof of Certain Informal Marriages"*:

(a) In any judicial, administrative, or other proceeding, the marriage of a man and woman may be proved by evidence that:

(1) a declaration of their marriage has been executed under Section 1.92 of this code; or

(2) they agreed to be married, and after the agreement they lived together in this state as husband and wife and there represented to others that they were married.

We now set forth § 1.91(b) as same appeared both before and after its amendment, effective September 1, 1989:

(Preamendment): In any proceeding in which a marriage is to be proved under Subsection (a)(2) of this section, the agreement of the parties to marry may be inferred if it is proved that they lived together as husband and wife and represented to others that they were married.

(Postamendment): A proceeding in which a marriage is to be proved under this

section must be commenced not later than one year after the date on which the relationship ended or not later than one year after September 1, 1989, whichever is later.

Noticeably, our legislature has removed from statutory law the "inferred" clause, which once assisted in breathing life into sometimes futile efforts at proving that, "they agreed to be married ..." § 1.91(a)(2).

■ Our appellant postures that § 1.91(b) as amended now requires proof as a matter of law that appellant and appellee "agreed to be married." We take appellant's contention to mean that unless there is direct and indisputable evidence that both appellant and appellee made an outright statement that "we agree to be married," then an informal or common-law marriage cannot be found. In this opinion we use the terms "informal marriage" and "common-law marriage" interchangeably. If appellant be correct then we believe that the amendment of § 1.91(b), effective September 1, 1989, would be tantamount to an abolition of informal marriage in Texas. It is elementary that in contested litigation where one seeks to establish an informal marriage, the opponent will more than likely emphatically deny same. We take appellant's premise to be that once a party denies the existence of an informal marriage it is then the proponent's burden to show the agreement of each party as a matter of law.

Was it the intent of our legislature in amending § 1.91(b) to cast such an insurmountable burden upon a party claiming to be married by common law that, regardless of evidence of living together over a period of almost thirty years, the birth of five children and many documented representations of marriage, nevertheless an informal marriage is not proven unless an unequivocable, undeniable, contractual agreement can be shown as a matter of law? We do not believe such to have been the intent of our legislature even though a review of legislative history regarding the 1989 amendment suggests strong support, by our House of Representatives, for the abolition of common-law marriage. *See* Joseph W. McKnight, *Family Law: Husband and Wife*, 44 Sw.L.J. 1 (1990).

Since we believe our legislature did not intend to abolish common-law marriages in Texas, what then is the significance that courts should give to the repeal of the "inferred" provision? We agree with Professor McKnight's analysis: "[I]t seems that the evidence of holding out must be more convincing than before the 1989 amendment." *Id.* at 2. In this regard this Court suggests that in nonjuried proceedings, detailed findings of fact and conclusions of law may well save the day.

We accept the amendment of § 1.91(b) as a strong message to trial courts to give a more detailed review of evidence on issues of common-law marriage.

We thus conclude and hold that regardless of the amendment of sec. 1.91(b), an agreement to be married may be inferred from direct or circumstantial evidence which preponderates that the parties lived together in the State of Texas and did, in Texas, represent to others that they were married. Absent those unlikely situations where there is direct evidence that the informal partners, standing on Texas soil and shouting in unison, "We agree that we are married," the proof of an agreement to be married will usually involve the parties' subjective feelings as well as their objective, fact-based observations. This evidence, though involving direct, eye-witness testimony from the participants, is nevertheless circumstantial in nature as it relates to the trial court in its function as factfinder. Evidence of cohabitation (living together) and evidence of "holding out" (representing to others that they are husband and wife) does constitute evidence-of-a-kind of an agreement to be married. The party claiming no agreement is certainly free to introduce evidence to rebut or counter any evidence that favors the existence of an agreement.

Section 1.91(b), as amended in 1989, creates a limitation period within which time a party must bring their action, i.e., within one year after the informal relationship ended or not later than one year after September 1, 1989. In our case the informal relationship ended July 1, 1981. Appellee brought her suit for divorce May 24, 1990, within one year of September 1, 1989. This certainly presents interesting questions which we need not discuss here. For the time being we shall leave those mind games to domestic relations classes in law schools.

Neither appellant nor appellee references the case of *Winfield v. Renfro,* 821 S.W.2d 640 (Tex.App.—Houston [1st Dist.] 1991, writ denied), which reversed and remanded a jury verdict, holding that the evidence was insufficient to establish the element of common-law marriage that the parties held themselves out to others, in Texas, as being husband and wife. Even though *Winfield* came down on October 10, 1991 the court makes no reference to § 1.91(b) either pre or postamendment. Whatever the reason, it is clear that the Houston Court, in a well written majority opinion holds that "evidence" of an agreement to be married may be inferred from cohabitation and representations, citing *Collora v. Navarro,* 574 S.W.2d 65 (Tex.1978); and *In re Estate of Giessel,* 734 S.W.2d 27 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.). *Winfield, supra* 821 S.W.2d at 646. The *Winfield* dissent, also well done, simply expresses a difference of opinion on the factual sufficiency of the evidence.

We believe *Winfield* to be a guiding light for trial courts in trying issues of informal marriage, whether juried or nonjuried.

*Winfield* makes clear the necessity for preponderating proof of each element required under § 1.91(a)(2). First, the proof must show an agreement to be married. To establish this element, the evidence must show that the parties intended to have a present, immediate, and permanent marital relationship and that they did in fact agree to be husband and wife. *Winfield, supra* 821 S.W.2d at 645, citing *Rodriguez v. Avalos,* 567 S.W.2d 85 (Tex. App.—El Paso 1978, no writ).

Second, the proof must show that the parties lived together in the State of Texas, as husband and wife. Living together in a state other than Texas will not do. See *Williams v. Home Indem. Co.,* 722 S.W.2d 786 (Tex.App.—Houston [14th Dist.] 1987, no writ).

Third, there must be representations by the parties, to others, that they are married. The statutory requirement of "represented to others" is synonymous with the judicial requirement of "holding out to the public." *Giessel, supra* 734 S.W.2d at 30.

Although the three elements listed may occur at different times, until all three exist, there is no common-law marriage. *Winfield, supra* 821 S.W.2d at 646, citing, *Bolash v. Heid,* 733 S.W.2d 698, (Tex. App.—San Antonio 1987, no writ).

We hold that evidence sufficient to support a finding on the second and third elements can support a finding on the first element, "that they did in fact agree to be husband and wife."

We are faced with a cold and somewhat lacking record from which we must evaluate the following four points of error:

### POINT OF ERROR NO. ONE

THERE IS NO EVIDENCE TO SUPPORT THE TRIAL COURT'S JUDGMENT THAT A COMMON LAW MARRIAGE EXISTED BETWEEN APPELLANT AND APPELLEE.

### POINT OF ERROR NO. TWO

THE EVIDENCE IS INSUFFICIENT TO SUPPORT THE TRIAL COURT'S DECISION THAT A COMMON LAW MARRIAGE EXISTED BETWEEN APPELLANT AND APPELLEE.

## POINT OF ERROR NO. THREE

THERE IS NO EVIDENCE TO SUPPORT THE TRIAL COURT'S JUDGMENT THAT A COMMON LAW MARRIAGE BETWEEN APPELLANT AND APPELLEE EXISTED ON MARCH 22, 1972.

## POINT OF ERROR NO. FOUR

THE EVIDENCE IS INSUFFICIENT TO SUPPORT THE TRIAL COURT'S DECISION THAT A COMMON LAW MARRIAGE BETWEEN APPELLANT AND APPELLEE ON MARCH 22, 1972. (sic)

■ Appellant says there is no evidence of informal marriage. Appellee testified that in the fall of 1964, "we came to Texas. Dr. Russell, the child, and I came to Dallas and we got an apartment there." Appellee's testimony also showed that the parties, along with their first child, maintained a common household. The record is undisputed that from 1964 until the time of trial, appellant and appellee resided in the State of Texas. Appellee testified that since 1966, appellant and appellee maintained a residence together at 2370 Pecos in Beaumont, Jefferson County, Texas.

In 1969 appellee filed suit against appellant seeking a divorce alleging that the parties had been married since 1964. Petitioner's exhibit No. 2 was admitted by the trial judge, such exhibit being "Plaintiffs Original Petition." This exhibit, which is partially illegible, does not appear to reference an informal marriage. This suit for divorce was subsequently dismissed at appellee's request.

Beginning in 1964 appellant and appellee filed income tax returns with the Internal Revenue Service, as husband and wife. Appellee introduced into evidence only one such return for the year 1979. The statement of facts indicate that appellee had with her at trial Internal Revenue records dating back to 1966, however, no attempt was made to place these records into evidence.

Photographs of appellant, appellee and the children were admitted into evidence.

Further, the trial court admitted "petitioner's exhibit 4", titled, "Agreement of Limited Partnership," being a fifty page document representing the purchase of real property upon which Beaumont Medical and Surgical Hospital is now located. This document, dated and effective November 8, 1972, required a "Joinder By Spouse" and appellee executed same at appellant's request.

Evidence also reveals that appellee was listed, shown, or represented to be appellant's spouse in the Jefferson County Medical Society Womens Auxiliary.

■ "No evidence" points must, and may only, be sustained when the record discloses one of the following situations: "(a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; (d) the evidence establishes conclusively the opposite of the vital fact." Robert W. Calvert, *"No Evidence"* and *"Insufficient Evidence" Points of Error*, 38 Tex.L.Rev. 361, 362–63 (1960). When considering legal sufficiency or "no evidence" points, we consider only the evidence, and reasonable inferences therefrom, which viewed in its most favorable light supports the finding and disregard all evidence and inferences to the contrary. *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965). If there is any probative evidence to support the finding, the point must be overruled. *Id.* In a factual sufficiency challenge, we consider all of the evidence including that which is contrary to the verdict. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951). We may sustain a factual sufficiency point only if we determine that the finding of a vital fact is so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Id.*

We believe that the evidence which we have recited clearly shows cohabitation and

holding out, and is, standing alone, sufficient for our overruling appellant's first no evidence point. We do believe that there is evidence in the record supportive of a common-law marriage and we must now determine whether such evidence was insufficient to support the trial court's judgment.

Appellant denies that he ever agreed to be married to appellee. Appellee's version, under cross-examination, is as follows:

Q. And he came and went as he saw fit with you?

A. Most definitely.

Q. And the whole time you have been married he came and went as he saw fit?

A. Yes, sir.

Q. And the whole time that you all were together, before you all got married in '81, he came and went as he saw fit; isn't that right?

A. Yes, sir.

Q. And he never one time ever told you that he was married to you, did he?

A. Yes, sir, he did.

Q. Okay. Now, when did you have this remembrance. We took your deposition under oath in Mr. Sparks' office on October 24, 1990, and you were specifically asked that he never told you he considered himself to be married to you, did he, and you answered, "I don't recall." So could you tell me now when you have this revolation (sic) that you remember something as important as this, tell us?

A. He always showed me, when I was here in Beaumont, to be his wife. He was questioned many times. He was involved in other lawsuits instigated by his women. I was always put forth as the wife.

Q. But did he ever tell you he considered himself to be married to you, yes or no?

A. Yes, he did.

Q. When?

A. I can't pinpoint that for you and you know it.

Q. Well, then, you don't recall, it is the correct answer when you were specifically asked that on the deposition, he was satisfied with the arrangement just like it was, wasn't he?

A. But we were held out to be husband and wife.

Q. Yes, ma'am. Yes, ma'am, I think all of this shows that you told the Internal Revenue that you signed it. You told various and sundry people that. But the agreement between you and this man to be married never happened?

A. In my opinion we had an agreement.

Q. Yes, ma'am, that's your opinion. But this man never once, not one time, until he married you in 1981, when he was about to die of a stroke, did he ever tell you he was married, did he?

A. In my opinion we were married.

Q. Yes, ma'am, I understand that that was your opinion. But the statement from this man to you, "Honey, we are married," he never told you that, did he? You wanted him to do that but he never did that, did he?

A. No, sir.

Obviously we do not have proof of an outright statement by either appellant or appellee of an agreement to be married. We now determine whether or not the evidence of cohabitation and holding out was of a nature sufficient to support the trial court's judgment. We believe that our review of the evidence should focus primarily on the issue of holding out to the public to be husband and wife, cohabitation being clear, for we believe that the evidence clearly supports far more than a mere passive cohabital relationship between appellant and appellee. The evidence shows that appellant and appellee lived together for long periods of time.

The court in *Winfield* reversed and remanded that cause due to factual insufficiency of the evidence on the "holding out" question. The Houston Court, in reviewing the evidence, found that in none of the

documents which Sandra Renfro was required to state her marital status, did she state that she was married. Sandra Renfro contacted Winfield's brother for purposes of obtaining insurance and stated upon the insurance form that she was single. The court placed emphasis on the fact that this representation was not to a stranger but to a member of Winfield's own family, a person that would normally know if the couple was holding themselves out as a married couple. When Renfro signed her daughter's birth certificate, a child fathered by Winfield, she used the name Renfro and not Winfield. Upon filing her tax return, Renfro indicated that she was a single person.

In the few exhibits proffered at trial, such as the 1979 income tax return and the "Agreement of Limited Partnership", appellee was represented to be the spouse of appellant. Clearly the signing of these two documents were not events or occurrences under the control of appellee. Were it not for the agreement, suggestion, or perhaps insistence of appellant, appellee probably would have had no say in the matter. We believe that from this evidence the trial court could infer that it was appellant who sought appellee's participation in these representations. Appellant testified that the reason appellee signed the income tax return was due to advice from appellant's accountant. We may assume from this that there was some advantage to be gained by filing a "married" tax return. We find no explanation or reason for requesting appellee to sign the "Agreement of Limited Partnership." The record does not speak of any advantage to be gained by requiring the signature of appellee. We believe that this objective evidence of holding out to be husband and wife, brought about at the insistence of appellant, was evidence of sufficient weight for the trial court to "infer" an agreement to be married. We overrule appellant's point of error number two.

 Regarding point of error number three and applying the "no evidence" standard of review previously set forth we also overrule this point. Appellee testified that in the petition for divorce filed by Sarah Corbin against appellant, that appellant asserted as his defense to that action that he was married to Margaret. When appellant was asked whether or not his defense to the suit by Corbin was that he was married to Margaret, appellant simply stated "I'm not sure." The records of the Corbin lawsuit were never offered into evidence; the record simply shows some brief testimony regarding same and a rather lengthy discussion between the court and the counsel regarding that suit. We determine that appellant's contention that there was no evidence to support the trial court's finding of March 22, 1972 as the beginning date of an informal marriage between appellant and appellee must be overruled. The evidence is by no means clear as to the date or dates relating to the Corbin lawsuit. The evidence of that suit is based on oral testimony which is lacking as to a date certain. We cannot agree however, that there is no evidence to support March 22, 1972, as a beginning date. We do find that the evidence is insufficient to support such date and we therefore sustain appellant's point of error number four.

The trial court based its judgment of March 22, 1972 as the beginning date of an informal marriage between appellant and appellee upon what the trial court called a judicial admission. Other than scant oral testimony regarding the Corbin lawsuit we find no support for the trial court's determination that appellant judicially admitted on, March 22, 1972, that he was married to appellee. We are left to wonder whether appellant made such affirmative and defensive allegations in pleadings or through oral testimony in that proceeding. The record does furnish us with a cause number in the Corbin suit but gives us no support for the trial court's determination. The record is confusing at best as to when and how appellant made a judicial admission. In a discussion between the court and respective counsel several different dates were discussed. The court was of the opinion

that the Corbin proceeding was held in 1968. We review a portion of this exchange:

> THE COURT: I believe that this other divorce case was filed in '68 ... I don't think the evidence showed a particular date in '68 when this divorce was filed ...
>
> MR. MATHENY: Judge I believe it was 1971. I don't know where anyone has got '68. I don't know why you think that that was the time but I thought that the testimony was the year of 1971, when another lady sued him for divorce.
>
> THE COURT: Then let's go back over the evidence and I will find that the other lady sued for divorce, that he came in, made an admission that this other lady was his wife. I'm going to find that to be the date of the common-law marriage.
>
> MR. MATHENY: Judge, are you finding that the date of the common-law marriage was the date of the prior inconsistent position in the other divorce case? Is that what you are finding?
>
> MR. SPARKS: Yes.
>
> THE COURT: I believe that's what I find.
>
> MR. MATHENY: Judge, I believe that is March 22, 1972.
>
> THE COURT: Okay. Is that when it is, Mike?
>
> MR. MATHENY: Cause No. 80049–C.
>
> THE COURT: All right. That would be March 22, of 1972. Okay. We will find that then. All right.

The actual finding of the trial court as set forth in the judgment was:

> IT IS DECREED and the Court finds affirmatively that there was an informal marriage between Petitioner, Margaret Ann Russell, and Respondent, James Lambie Russell, on March 22, 1972. The Court further finds that said date was the date that Respondent affirmatively stated in Cause No. 80049–C, In the Matter of the Marriage of Sarah Russell and James L. Russell that Respondent, James Lambie Russell, was married to Margaret Ann Russell.

We are now faced with three possible and distinct evidentiary alternatives as a basis for judgment. First, was it the intent of the trial court to take "judicial notice" of the entire file, record or proceeding in Cause No. 80049–C? TEX.R.CIV.EVID. 201. Second, did the trial court simply find that appellant had made a "judicial admission" in Cause No. 80049–C which the trial court viewed as either an admission conclusive on the pleader or an ordinary admission only? Third, did the trial court rely on a prior inconsistent statement by Dr. Russell in Cause No. 80049–C as impeachment of his testimony in this cause? TEX.R.CIV.EVID. 613.

The best that we can determine is that our trial court perhaps used a statement made by appellant, in a prior pleading, to conclusively establish, as a matter of law, appellant's agreement to be married. "[A] party's admission of a fact in the pleadings on which the case is being tried is a judicial admission, conclusive on the pleader. (*matter of law*). Statements in pleadings filed in another case may be received as ordinary admissions only." (parenthetical material ours). 35 TEX.JUR.3d *Evidence* § 246 (1984).

It may well be that there exists such a pleading but it is not before us and it was not before the trial court for consideration. We therefore hold that the evidence before the trial court was insufficient to uphold a finding that March 22, 1972 was the beginning date of the common-law marriage. We sustain appellant's point of error four which calls for a reversal and remand of this matter to the trial court for trial on the issue of when the common-law marriage began.

**REVERSED AND REMANDED.**