NO. 07-02-0416-CV



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL A



MAY 17, 2004



______________________________




ROBERT C. "BOB" NICHOLS A/K/A R. C. "BOB" NICHOLS, APPELLANT



V.



CLAUDIA LIGHTLE AND EDWIN LEE MURRAY, APPELLEE




_________________________________



FROM THE 411TH DISTRICT COURT OF SAN JACINTO COUNTY;



NO. 9880; HONORABLE ROBERT H. TRAPP, JUDGE



_______________________________



Before JOHNSON, C.J. and REAVIS and CAMPBELL, JJ.

OPINION


 Appellant Robert C. "Bob" Nichols (Nichols) presents three issues challenging a
summary judgment for appellee Claudia Lightle (Claudia), quieting title to some 420 acres (1)
in San Jacinto County and denying his counterclaim in trespass to try title. We affirm.

Factual and Procedural Background

 Talmadge Ott owned property located in San Jacinto County, adjacent to a tract in
the John Bricker Survey owned by Nichols. In 1976, Ott conveyed his property to Nichols'
wife Francis Nichols as trustee. (2) The property was described in the deed from Ott as "all
the land in the M.P. Clark Survey and the John Bricker Survey, San Jacinto County, Texas,
which I own or claim," including two described ten-acre tracts, one of which contained Ott's
house, "together with all remaining properties under my fences and which I have used over
a long period of years." 

 In 1983, Nichols executed two deeds of trust in favor of First National Bank of Trinity
(the Bank), mortgaging several tracts. The deeds of trust are not in the record. Although
they apparently encompassed at least two tracts in the M. P. Clark Survey, among other
tracts, the record is not clear to what extent the land subject to the deeds of trust included
land conveyed by Ott's deed to Frances Nichols. (3) In any event, on October 4, 1988, the
Bank foreclosed the liens under both deeds of trust. 

 Edwin Murray and his wife Dianne Murray acquired the 420 acres from the Bank by
deed dated October 13, 1993, and executed a deed of trust of the same date in favor of
the Bank. Neither of these documents have been included in the record before us. In
October 1997, the Murrays were divorced, each retaining an undivided one-half interest
in the property. In an unrelated but significant development, appellee Claudia Lightle and
Thomas "Sandy" Lightle were divorced on May 28, 1998.

 In June 1999, Dianne Murray executed a deed to Nichols for her undivided interest
in the 420 acres. On a date not shown in the record, Edwin Murray filed suit against
Nichols in the 411th District Court of San Jacinto County, seeking an injunction preventing
Nichols from interfering with his use of the 420 acres. This action was assigned cause
number 9691. On July 6, 1999, Nichols brought suit in 258th District Court of San Jacinto
County against Claudia, who he alleged had purchased the Murrays' note secured by the
420 acres from the Bank, and attorney Fritz Faulkner, alleged to be acting as substitute
trustee under the deed of trust. Nichols there also alleged he owned an undivided one-half
interest in the property, and "through some misleading field notes used by a surveyor for
[another bank], the mortgaged property was located over onto the southwestern 100 acres
in the M.P. Clark Survey, which was not supposed to be included within his survey. 10
acres of the overlap is owned by Frances Nichols, Trustee[.]" Nichols sought to enjoin
foreclosure of the deed of trust lien granted by the Murrays, among other relief. This action
was given cause number 9809. On July 30, 1999, the 411th District Court rendered
judgment in cause number 9691 temporarily enjoining Nichols from interfering with Edwin
Murray's use of the 420 acres during the pendency of the suit, finding that Murray had
established 100 of the 420 acres as his homestead, and awarding damages against
Nichols. The written judgment was signed August 2nd. Nichols brought an appeal from that
judgment. (4)

 On August 3, 1999, the lien under the Murrays' deed of trust to the Bank was
foreclosed. Claudia was the high bidder at the foreclosure sale, and Faulkner as substitute
trustee conveyed the 420 acres to Claudia for $120,000. The property description
contained in this deed described the 420 acres in five tracts, three of them in the M.P.
Clark Survey, and made reference to the October 13, 1993 deed to the Murrays, in which
the tracts were said to be more particularly described. 

 Shortly after this foreclosure, Sandy Lightle executed a deed to Nichols, dated
August 11, 1999, purportedly conveying his "undivided one-half community interest" in the
420 acres. (5) An affidavit executed in connection with the deed shows that Sandy had not
overlooked his divorce from Claudia, but said a common-law marriage had arisen after the
divorce and before she purchased the property. It said Claudia "bought . . . the property
for the amount of the note for our account as community property." The assertions were
repeated in a second affidavit Sandy executed in September 1999. 

 Nichols recorded the deed from Sandy on September 29, 1999. Some time in the
fall of 1999, First Bank & Trust of Cleveland, Texas ("FBT") sought to execute on Nichols'
interest in the 420 acres to satisfy a judgment it apparently held against him. Claudia filed
her original petition in this action against Nichols and FBT on December 2, 1999, asserting
that Nichols had no interest in the property and citing, inter alia, the judgment entered in
cause number 9691. She sought an injunction against execution on the property by FBT
pending resolution of the appeal in cause number 9691. 

 The trial court held a hearing in this case on December 22, 1999, at which FBT's
attorney conceded that no execution on the property was pending. Nevertheless, the court
heard testimony from Claudia, Sandy and Nichols. Claudia testified that she never
remarried Sandy after their divorce, that he abused cocaine and suffered psychological
problems, that he was occasionally homeless, and that she sometimes provided him with
food and work and let him sleep at her home irregularly. She denied entering into a
common law relationship. 

 Sandy testified that the statements in his August and September 1999 affidavits
were false, that he was under the influence of cocaine at the time and did not read the
August deed or affidavit before signing them. Nichols testified that he paid Sandy $11,500
of an agreed $50,000 for his interest in the 420 acres, and that Sandy did not appear to
be under the influence of drugs when he signed the deed and affidavit. At the conclusion
of the hearing the court temporarily enjoined execution on any of the property pending a
final hearing. 

 Before a final injunction hearing, Claudia nonsuited her claim against FBT. Some
months later, and after dismissal of the appeal of cause number 9691, (6) Nichols filed a
counterclaim of trespass to try title against Claudia alleging he was the owner in fee simple
of certain tracts, (7) under deeds and by adverse possession. He asserted that he was
unlawfully dispossessed of the tracts, giving the date of his ouster as January 1, 1999. (8)
The pleading also named Edwin Murray as a third party defendant, alleging that Murray
had joined Claudia in the unlawful dispossession. Alternatively, the petition alleged
Nichols was a tenant in common with Claudia and Murray in the entire 420 acres. 

 Claudia then filed a second amended petition and answer to Nichols' counterclaims. 
This pleading converted Claudia's suit for an injunction into one to quiet title. Claudia
sought to cancel the deed from Dianne Murray to Nichols, and the deed from Sandy to
Nichols, and to quiet title in the 420 acres in her. (9) The petition challenged Nichols' claim
of adverse possession, primarily on the basis that it was interrupted by the 1988
foreclosure. In further explication of her claims, Claudia stated she was not asserting any
claim to tracts owned by Nichols that adjoined the 420 acres. (10) 

 At the same time, Claudia filed a traditional motion for summary judgment. She
asserted that the deed from Sandy to Nichols should be canceled because he had no
interest to convey. As support she relied on the 1998 divorce decree, the deed to her
individually, her own testimony at the prior hearing, and that of Sandy, that they never
remarried. She asserted the deed from Dianne Murray to Nichols should be canceled
because her interest in the 420 acres was terminated by the August 1999 foreclosure and
trustee's sale to Claudia. The motion also cited the order in cause number 9691 enjoining
Nichols from interfering with Edwin Murray's use of the 420 acres. The motion addressed
Nichols' counterclaims, attaching copies of the 1988 substitute trustee's deeds by which
the liens under the 1983 deeds of trust to the Bank were foreclosed. 

 Nichols filed an amended counterclaim, reasserting his claims of adverse
possession and alleging in the alternative that he was a tenant in common with Claudia,
and seeking partition. He also responded to Claudia's motion for summary judgment,
arguing it should be denied "as regards the 100 acre tract" described in an exhibit to his
counterclaim because of Claudia's disclaimer in her second amended petition. He also
provided several affidavits in support. The first was from a surveyor named C.A. McKinley
that described a rectangular 100-acre tract in the northwest portion of the M.P. Clark
Survey. Nichols made his own affidavit reciting the deed from Talmadge Ott to Frances
and claiming it included "the entire southwest 100 acres of the northwest 300 acres" of the
Clark Survey. The affidavit stated that Nichols had moved a house onto the property
purchased from Ott and moved Ott's house to another location. It also recited the names
of persons who lived in that house at various times, including Claudia and Sandy. 

 Nichols also submitted the affidavit of his son Robert Charles Nichols, which recited
his familiarity with the land, and sought to describe the land claimed by Talmadge Ott. 
Kenneth W. Hill made an affidavit that stated he was familiar with the land, attempted to
describe the 100 acre tract conveyed to Frances Nichols with relation to the surrounding
tracts, and stated that he had lived in the house on that tract briefly in 1985. An affidavit
from Billy Mills averred that he did work, paid for by Nichols, on "Bob Nichols' wife's house
off the end of Walker Road north of Midway," and that Edwin Murray was present and, after
initially objecting to Mills' presence, later had acquiesced in Nichols' claim of ownership of
the house.

 Nichols' response also included Sandy Lightle's August 11, 1999 affidavit and
another affidavit dated June 23, 2000. In the latter affidavit Sandy stated he was not under
the influence of cocaine in August 1999 when he executed the deed to Nichols and that
he testified falsely in court, having been threatened by Claudia. The affidavit also
reasserted his claim that a common law marriage was established after their 1998 divorce
and before Claudia purchased the 420 acres, concluding: "We have had a normal marriage
since the divorce." The affidavits of Hollys Heasley and Molly Wells, who had notarized
Sandy's signatures on his August 1999 and June 2000 affidavits, also were included. 

 The trial court granted Claudia's motion for summary judgment and denied Nichols'
counterclaims by a written order signed June 27, 2002. That order described the land at
issue as the 420 acres described in the August 3, 1999 deed to Claudia. The court
cancelled and declared invalid the deeds from Sandy Lightle and Dianne Murray to
Nichols, and granted Claudia judgment against Nichols, quieting title to the 420 acres in
her. After filing a motion for new trial, Nichols timely perfected this appeal.

Issues on Appeal

 Nichols now presents three issues for our review. They are that the trial court erred
in granting summary judgment: (1) on the basis that the deed from Sandy conveyed no
title; (2) because it disregarded evidence concerning his counterclaim for 100 acres; and
(3) finding his claims were barred by res judicata. He has not challenged the judgment's
cancellation of his deed from Dianne Murray.

 The standards applicable to review of summary judgments are well established, and 
a detailed recitation of them is unnecessary. See Tex. R. Civ. P. 166a. It is sufficient to
note a movant has the burden of showing that there are no genuine issues of material fact
and that the movant is entitled to judgment as a matter of law. We take evidence favorable
to the non-movant as true, and indulge every reasonable inference in favor of the
non-movant. Nixon v. Mr. Property Management Co., 690 S.W.2d 546, 548-49 (Tex. 1985). 

Sandy Lightle Deed

 Nichols makes two arguments in support of his first issue. He first argues that the
excerpts from the reporter's record of the December 22, 1999 hearing, which were
attached to Claudia's summary judgment motion and which reflected the testimony of
Claudia and Sandy that they did not remarry after their divorce, were not proper summary
judgment evidence because they were not accompanied by authentication by the court
reporter or other verification. Claudia correctly notes Nichols' argument raises a defect of
form and Nichols' failure to present a timely objection in the trial court waived any error. 
Tex. R. Civ. P. 166a(f); Jones v. Jones, 888 S.W.2d 849, 852 (Tex.App.--Houston [1st
Dist.] 1994, writ denied). (11) 

 Nichols also quotes Munoz v. Gulf Oil Co., 693 S.W.2d 372 (Tex. 1984), for the
proposition that "if there is no file mark on a statement of facts or any other indication it was
considered by the trial court at the time the motion for summary judgment was sustained,
it may not be considered on appeal." We do not find that holding applicable here. In
Munoz, the non-movant sought reversal based on testimony he had not presented to the
trial court in response to the motion for summary judgment. Here, the relevant portions of
the reporter's record were presented to the trial court. They were attached as an exhibit
to Claudia's motion for summary judgment and the trial court's order recites that he
considered the summary judgment evidence. Richman Trusts v. Kutner, 504 S.W.2d 539
(Tex.Civ.App.-Dallas 1973, writ ref'd n.r.e.), cited in Munoz, supports the finding that the
testimony was properly before the court here. In Richman the court refused to consider
a reporter's record that was never filed in the trial court and was not "incorporated by
reference in either the motion for summary judgment or the reply thereto." Id. at 541. 
Claudia did not merely incorporate the testimony by reference, she attached a copy of it
to her motion. 

 Nichols next argues his affidavit and those of Sandy Lightle, Kenneth Hill, Molly
Wells and Hollys Heasley establish the existence of a genuine question of fact on the
formation of a common law marriage between Sandy and Claudia after their 1998 divorce
and before she acquired the 420 acres in August 1999. Claudia responds that the
affidavits are insufficient. The issue is material because of the presumption that property
acquired by either spouse during marriage is community property. Tex. Fam. Code ann.
§ 3.03 (Vernon 1998).

 The elements of a common law, or informal, marriage are: (1) a man and woman
agreed to be married; (2) after the agreement they lived together in Texas as husband and
wife; and (3) they represented to others in the state that they were married. Tex. Fam.
Code ann. § 2.401 (Vernon 1998). In conformity with the standards applicable to summary
judgment review, we will ignore Sandy's testimony in open court that he did not remarry
Claudia. Because we conclude that the summary judgment evidence does not raise a
genuine question of fact concerning the third element, we focus only on the evidence
relevant to that issue. We first consider whether Sandy's affidavits raise a genuine question
of fact whether Sandy and Claudia represented to others in Texas that they were husband
and wife after their divorce.

 In his August 1999 and September 1999 affidavits Sandy stated: "A few days after
our divorce, we went back to living together as common law husband and wife. We lived
together, consummated the marriage, had the intent of being husband and wife, and held
out to others that we were husband and wife." In addition to the statement already noted,
Sandy's June 23, 2000 affidavit asserted, "I am the husband of Claudia M. Lightle by
common law marriage." Like the earlier affidavits, it stated that following their divorce he
and Claudia "went back to living together," and had regular sexual relations, "just as we did
before the divorce." Speaking of events following their divorce, it also stated, "After getting
out of jail, I came back home, and we lived together as husband and wife, just as we had
always done. She advised at least one witness whom I remember that 'we are husband
and wife.'" 

 Claudia also argues the affidavits are conclusory. Challenges to summary judgment
affidavits as conclusory allege a defect in substance rather than form and may be asserted
for the first time on appeal. Dailey v. Albertson's, Inc., 83 S.W.3d 222, 225 (Tex.App.--El
Paso 2002, no pet.). To avoid being conclusory, an affidavit must contain specific factual
bases, admissible in evidence and upon which conclusions are drawn. Id. An affidavit
consisting only of conclusions is not sufficient to raise an issue of fact. Id.; See Brownlee
v. Brownlee, 665 S.W.2d 111, 112 (Tex. 1984); Life Ins. Co. of Virginia v. Gar-Dal, Inc.,
570 S.W.2d 378, 381-82 (Tex. 1978). The statements relative to the third element in
Sandy's August 1999 and September 1999 affidavits simply paraphrase the statutory
language, stating "we held out to others that we were husband and wife." The affidavits
contain no specific factual bases for the statements; the statements are conclusory and
not sufficient to raise a genuine issue of fact on the element of representations of marriage
to others. 

 The statement in Sandy's June 2000 affidavit is barely more specific. There, Sandy
stated that Claudia advised at least one person they were married. The affidavit does not
give the name of the person, or when, where or under what circumstances the statement
was made. Perhaps we reasonably can infer that the statement was made in Texas, since
the record makes no reference to any event occurring outside our state. And perhaps we
can infer that the statement was made after the divorce and before Claudia's purchase of
the 420 acres. (12) But even if we draw from the statement all the inferences that are
reasonable, it is not sufficient to raise a genuine issue of fact as to whether Sandy and
Claudia's relationship met the third statutory element. At most, the statement reflects only
isolated references, which is not evidence of "holding out" to others that a marriage exists.
Ex parte Threet, 333 S.W.2d 361, 364 (Tex. 1960); Winfield v. Renfro, 821 S.W.2d 640,
651 (Tex.App.-Houston [1st Dist.] 1991, writ denied). Neither of Sandy's affidavits contains
evidence sufficient to raise a genuine issue of fact on the third element of a common law
marriage. See Tex. R. Civ. P. 166a(f).

 We next examine whether any of the other affidavits offered by Nichols filled the gap
left by Sandy's affidavit. Nichols' affidavit contained only one statement relevant to this
issue, that referring to the house on the disputed property and stating: "Claudia Lightle and
Sandy Lightle live there at the present time, or at least they frequently occupy it at night." 
This statement provides support for the second element of common law marriage, that of
living together, but is not probative of the third element. The same is true for the other
affidavits. Kenneth Hill's affidavit stated he saw Claudia and Sandy going to and from the
house on the Clark Survey and they introduced themselves to him by first name only. Molly
Wells and Hollys Heasley made no statement in their affidavits concerning representations
of marriage between Sandy and Claudia. None of these affidavits provide evidence that
Sandy and Claudia represented to others that they were married. The summary judgment
record does not show the existence of a genuine question of fact on whether Claudia and
Sandy were married at the time of her purchase of the 420 acres. We overrule Nichols'
first issue.

Counterclaim on Hundred Acres

 In his second issue Nichols challenges the summary judgment for Claudia denying
his counterclaim to a 100-acre tract of the M. P. Clark Survey described in an exhibit to his
pleadings. Nichols' arguments in support primarily recite his summary judgment evidence.
As we read his arguments, his position is that (1) Claudia is bound by the admission in her
pleadings disclaiming any interest in Nichols' adjacent land, (2) she failed to establish that
the 420 acres encompasses the 100-acre tract claimed by Nichols, and (3) he established
his title to the 100-acre tract by tracing his title to Talmadge Ott.

 Nichols' first argument makes too much of the language contained in Claudia's
second amended petition, (13) by which she disclaimed the 100 acres "that lies outside the
boundaries of the 420 acres." We do not agree that it constitutes an admission contrary
to her claim to quiet title to the described 420 acres. 

 Nor can we agree with Nichols' arguments that summary judgment was improper
because Claudia failed to present evidence showing whether the 420 acres included any
part of the 100 acres he described and claimed. Such proof was irrelevant to her ability
to establish conclusively her cause of action to cancel the deed from Sandy Lightle and
quiet title to the 420 acres as against Nichols' claims. The summary judgment evidence
established that Claudia acquired title to the land described in the October 13, 1993 deed
to the Murrays, by an August 3, 1999 deed from the substitute trustee to her. Her
summary judgment evidence also established that the deed from Sandy Lightle on August
11, 1999, conveyed no title. 

 With respect to Nichols' third argument, as noted, among the grounds set forth in
Claudia's motion for summary judgment was the 1988 foreclosure of Nichols' interest in
the 420 acres. Nichols' discussion of the summary judgment evidence tracing his interest
in the 100-acre tract omits any mention of his 1983 mortgage and the 1988 foreclosure of
that mortgage. Nor has he presented any challenge to the subsequent 1993 sale to the
Murrays, or the foreclosure and sale to Claudia in August 1999. Moreover, neither at trial
nor before this court has Nichols contested the proposition that the 420 acres conveyed
to Claudia was the same property subject to the 1988 foreclosure of his interest. He does
not contend that the summary judgment evidence raises an issue of fact concerning that
proposition. (14) To any degree the 100-acre tract made the basis of Nichols' counterclaim
in this litigation overlaps with the 420 acres, (15) that part of the 100-acre tract must be
regarded as properly subject to the trial court's judgment. The trial court did not err in
granting judgment on this summary judgment record quieting title to the 420 acres in
Claudia as against the claims asserted by Nichols. His second issue is overruled.

Conclusion

 Our disposition of appellant Nichols' first two issues makes review of his third issue
unnecessary. The trial court's judgment is affirmed.


 James T. Campbell

 Justice
1. The actual acreage at issue comprises 419.283 acres. For convenience, we use
the phrase "the 420 acres" to refer to the property described in the August 3, 1999
substitute trustee's deed to appellee Claudia Mercer Lightle. 
2. There is no suggestion in the record for whose benefit, or on what terms, Frances
Nichols was acting as trustee. She is not a party to this litigation, individually or as trustee.
The record does not address her absence.
3. The judgment entered by the trial court in the cause now on appeal clearly is
grounded, though, on the conclusion that the 420 acres at issue here is the same property
on which the Bank later foreclosed. As is discussed later in this opinion, Nichols has not
contested that conclusion. 
4. Claudia's brief states that cause numbers 9691 and 9809 were consolidated but
does not state when or refer to an order consolidating the cases. The August 2, 1999
judgment in cause number 9691 did make reference to Nichols as defendant and cross-plaintiff, and to Claudia as cross-defendant. It awarded damages against Nichols both to
Murray and Claudia. 
5. We express no opinion on the question of the interest that would have been
conveyed by the deed if it had been community property of Sandy and Claudia Lightle. 
6. The Ninth Court of Appeals dismissed the appeal of cause number 9691 pursuant
to an agreed motion to dismiss on June 22, 2000. 
7. The first tract was described by metes and bounds in the M.P. Clark Survey, the
second was 100 acres consisting of portions of the 420 acres at issue, as described in the
October 13, 1993 deed to the Murrays.
8. See Tex. R. Civ. P. 783.
9. See generally 5 F. Lange & A. Leopold, Texas Practice 2d: Land Titles and Title
Examination §§ 1091-96 (1992); Katz v. Rodriguez, 563 S.W.2d 627, 629 (Tex.Civ.App.-
Corpus Christi 1977, writ ref'd n.r.e.) (discussing distinction between statutory trespass to
try title action and suit to quiet title). 
10. The disclaimer language, which appeared in almost identical form in Claudia's
second amended petition and in her motion for summary judgment, read as follows:


 Defendant [Nichols] admittedly owns various tracts of land which join the
subject property (420 acres) on one side or the other. Plaintiff makes no
claims to any of defendant's 160 acre homestead in the John Bricker Survey,
nor the 80.8345 acres (known as the dump) that defendant described in his
pleadings, nor the 100 acres of defendant's that lies outside the boundaries
of the 420 acres which is the subject of this suit.
11. Trimble v. Gulf Paint & Battery, Inc
. 728 S.W.2d 887 (Tex.App.-Houston [1st Dist.]
1987, no writ), cited by Nichols, is not to the contrary. That case holds the absence of a
jurat on a purported affidavit is not just a formal defect but is substantive and not waived
by failure to bring it to the trial court's attention. Citing the Government Code definition of
"affidavit," Tex. Gov't Code Ann. § 312.011, and other authority, the court noted that a
purported affidavit missing the jurat is not an affidavit but simply an unsworn statement and
not competent summary judgment proof. 728 S.W.2d at 889.
12. All three of the required elements of a common law marriage must exist at the
same time. Bolash v. Heid, 733 S.W.2d 698, 699 (Tex.App.-San Antonio 1987, no writ);
Gary v. Gary, 490 S.W.2d 929, 935 (Tex.Civ.App-Tyler 1973, writ ref'd n.r.e.).
13. Nichols also points to differences in the disclaimer language in Claudia's second
amended petition and a late-filed third amended petition. We need not address that issue
because our analysis and conclusion would be the same under either petition.
14. We note that Nichols' pleadings in this litigation did not assert the claim of a
surveying error and ten-acre overlap he made in cause number 9809.
15. This is a determination that cannot be made based on the record before us, and
one that we view as irrelevant to the trial court's judgment quieting title to the 420 acres in
Claudia. To the extent that acreage described in Nichols' counterclaim lies outside the
boundaries of the 420 acres, we view it as unaffected by the trial court's judgment. 



.MsoQuote
 {mso-style-priority:29;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Quote Char";
 mso-style-next:Normal;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:0in;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 color:black;
 mso-bidi-language:EN-US;
 font-style:italic;}
p.MsoIntenseQuote, li.MsoIntenseQuote, div.MsoIntenseQuote
 {mso-style-priority:30;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Intense Quote Char";
 mso-style-next:Normal;
 margin-top:10.0pt;
 margin-right:.65in;
 margin-bottom:14.0pt;
 margin-left:.65in;
 line-height:115%;
 mso-pagination:widow-orphan;
 border:none;
 mso-border-bottom-alt:solid #4F81BD .5pt;
 padding:0in;
 mso-padding-alt:0in 0in 4.0pt 0in;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 color:#4F81BD;
 mso-bidi-language:EN-US;
 font-weight:bold;
 font-style:italic;}
span.MsoSubtleEmphasis
 {mso-style-priority:19;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 color:gray;
 font-style:italic;}
span.MsoIntenseEmphasis
 {mso-style-priority:21;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 color:#4F81BD;
 font-weight:bold;
 font-style:italic;}
span.MsoSubtleReference
 {mso-style-priority:31;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 font-variant:small-caps;
 color:#C0504D;
 text-decoration:underline;
 text-underline:single;}
span.MsoIntenseReference
 {mso-style-priority:32;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 font-variant:small-caps;
 color:#C0504D;
 letter-spacing:.25pt;
 font-weight:bold;
 text-decoration:underline;
 text-underline:single;}
span.MsoBookTitle
 {mso-style-priority:33;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 font-variant:small-caps;
 letter-spacing:.25pt;
 font-weight:bold;}
p.MsoTocHeading, li.MsoTocHeading, div.MsoTocHeading
 {mso-style-noshow:yes;
 mso-style-priority:39;
 mso-style-qformat:yes;
 mso-style-parent:"Heading 1";
 mso-style-next:Normal;
 margin-top:24.0pt;
 margin-right:0in;
 margin-bottom:0in;
 margin-left:0in;
 margin-bottom:.0001pt;
 line-height:115%;
 mso-pagination:widow-orphan lines-together;
 page-break-after:avoid;
 font-size:14.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#365F91;
 mso-bidi-language:EN-US;
 font-weight:bold;}
span.Heading1Char
 {mso-style-name:"Heading 1 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 1";
 mso-ansi-font-size:14.0pt;
 mso-bidi-font-size:14.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#365F91;
 font-weight:bold;}
span.Heading2Char
 {mso-style-name:"Heading 2 Char";
 mso-style-noshow:yes;
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 2";
 mso-ansi-font-size:13.0pt;
 mso-bidi-font-size:13.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 font-weight:bold;}
span.Heading3Char
 {mso-style-name:"Heading 3 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 3";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 font-weight:bold;}
span.Heading4Char
 {mso-style-name:"Heading 4 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 4";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 font-weight:bold;
 font-style:italic;}
span.Heading5Char
 {mso-style-name:"Heading 5 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 5";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#243F60;}
span.Heading6Char
 {mso-style-name:"Heading 6 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 6";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#243F60;
 font-style:italic;}
span.Heading7Char
 {mso-style-name:"Heading 7 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 7";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#404040;
 font-style:italic;}
span.Heading8Char
 {mso-style-name:"Heading 8 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 8";
 mso-ansi-font-size:10.0pt;
 mso-bidi-font-size:10.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;}
span.Heading9Char
 {mso-style-name:"Heading 9 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 9";
 mso-ansi-font-size:10.0pt;
 mso-bidi-font-size:10.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#404040;
 font-style:italic;}
span.TitleChar
 {mso-style-name:"Title Char";
 mso-style-priority:10;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Title;
 mso-ansi-font-size:26.0pt;
 mso-bidi-font-size:26.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#17365D;
 letter-spacing:.25pt;
 mso-font-kerning:14.0pt;}
span.SubtitleChar
 {mso-style-name:"Subtitle Char";
 mso-style-priority:11;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Subtitle;
 mso-ansi-font-size:12.0pt;
 mso-bidi-font-size:12.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 letter-spacing:.75pt;
 font-style:italic;}
span.QuoteChar
 {mso-style-name:"Quote Char";
 mso-style-priority:29;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Quote;
 color:black;
 font-style:italic;}
span.IntenseQuoteChar
 {mso-style-name:"Intense Quote Char";
 mso-style-priority:30;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Intense Quote";
 color:#4F81BD;
 font-weight:bold;
 font-style:italic;}
p.NewDocument, li.NewDocument, div.NewDocument
 {mso-style-name:"New Document";
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-next:Normal;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:0in;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:12.0pt;
 mso-bidi-font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
span.BalloonTextChar
 {mso-style-name:"Balloon Text Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Balloon Text";
 mso-ansi-font-size:8.0pt;
 mso-bidi-font-size:8.0pt;
 font-family:"Tahoma","sans-serif";
 mso-ascii-font-family:Tahoma;
 mso-hansi-font-family:Tahoma;
 mso-bidi-font-family:Tahoma;
 mso-bidi-language:EN-US;}
span.HeaderChar
 {mso-style-name:"Header Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Header;
 mso-ansi-font-size:11.0pt;
 mso-bidi-font-size:11.0pt;
 mso-bidi-language:EN-US;}
span.FooterChar
 {mso-style-name:"Footer Char";
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Footer;
 mso-ansi-font-size:11.0pt;
 mso-bidi-font-size:11.0pt;
 mso-bidi-language:EN-US;}
span.SpellE
 {mso-style-name:"";
 mso-spl-e:yes;}
span.GramE
 {mso-style-name:"";
 mso-gram-e:yes;}
.MsoChpDefault
 {mso-style-type:export-only;
 mso-default-props:yes;
 font-size:10.0pt;
 mso-ansi-font-size:10.0pt;
 mso-bidi-font-size:10.0pt;
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:Arial;
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:Arial;}
 /* Page Definitions */
 @page
 {mso-footnote-separator:url("07-09-0147.CR%20opinion2_files/header.htm") fs;
 mso-footnote-continuation-separator:url("07-09-0147.CR%20opinion2_files/header.htm") fcs;
 mso-endnote-separator:url("07-09-0147.CR%20opinion2_files/header.htm") es;
 mso-endnote-continuation-separator:url("07-09-0147.CR%20opinion2_files/header.htm") ecs;}
@page Section1
 {size:8.5in 11.0in;
 margin:1.0in 1.0in 1.0in 1.0in;
 mso-header-margin:.5in;
 mso-footer-margin:.5in;
 mso-title-page:yes;
 mso-footer:url("07-09-0147.CR%20opinion2_files/header.htm") f1;
 mso-paper-source:0;}
div.Section1
 {page:Section1;}
-->








NO. 07-09-00147-CR

 

IN THE COURT OF APPEALS

 

FOR THE
SEVENTH DISTRICT OF TEXAS

 

AT
AMARILLO

 

PANEL D

 



AUGUST
17, 2010

 



 

ERIC LEE DIAZ, APPELLANT

 

v.

 

THE STATE OF TEXAS, APPELLEE 



 



 

 FROM THE 47TH DISTRICT COURT OF RANDALL
COUNTY;

 

NO. 16,202-A; HONORABLE HAL MINER, JUDGE



 



 

Before QUINN,
C.J., and CAMPBELL and PIRTLE, JJ.

 

 

MEMORANDUM OPINION

 

Appellant Eric Lee
Diaz appeals from the judgment revoking his
community supervision and sentencing him to fourteen years of imprisonment and
imposing on him a $10,000 fine. 
Appellant's attorney has filed a brief in compliance with Anders
v. California, 386 U.S. 738, 87 S.Ct. 1396, 18
L.Ed.2d 493 (1967) and In re Schulman, 252 S.W.3d 403 (Tex.Crim.App. 2008) and certifies that there are no
non-frivolous issues to appeal.  Agreeing with
appointed counsel=s conclusion the record fails to show any
arguably meritorious issue that could support the appeal,
we affirm the trial court=s judgment.

In July 2004, appellant was indicted for aggravated
assault with a deadly weapon.[1]   In November 2004, appellant plead guilty to
that offense and was placed on community supervision for a period of five
years.  Appellant=s supervision was conditioned on his
compliance with specified terms and conditions. In 2006, after appellant
violated terms of his community supervision, his supervision was extended with
supplemental terms added.

Thereafter, in
April 2008, the State filed a motion to revoke appellant=s community
supervision, alleging ten violations. 
This motion was heard by the court in March 2009.  Appellant plead true to eight
allegations.  The court received evidence
concerning each.

Appellant=s probation
officer testified in support of the motion to revoke.  The victim of the aggravated assault with a
deadly weapon also testified, describing the events that caused a compound
fracture to his nose, an exposed sinus cavity, cuts and bruises all over his
body, and a dislocated shoulder. He identified appellant as the individual who
hit him in the face with a brick.

Appellant
testified at the hearing, explaining his version of the events involved in the
assault.  He denied using a brick to hit
the victim in the head.  Appellant
admitted to several of the other allegations made by the State and expressed
his desire to remain on probation and be with his young children. 

Based on appellant=s pleas of Atrue@ and the evidence
presented before it, the court revoked appellant=s community
supervision and assessed appellant=s punishment at confinement in the Institutional
Division for a period of fourteen years. 
The court certified appellant=s right of appeal, and he timely filed notice of
appeal.

Thereafter,
appellant's appointed appellate counsel filed a motion to withdraw and a brief
in support pursuant to Anders in which he certifies that he has
diligently reviewed the record and, in his professional opinion, under the
controlling authorities and facts of this case, there is no reversible error or
legitimate grounds on which a non-frivolous appeal arguably can be
predicated.  The brief discusses the
procedural history of the case and the proceedings in connection with the
motion to revoke appellant=s community
supervision.  Counsel discusses the
applicable law and sets forth the reasons he believes there are no arguably
meritorious issues on which to appeal. 
Counsel has certified that a copy of the Anders brief and motion
to withdraw have been served on appellant, and that counsel has advised
appellant of his right to review the record and file a pro se response. Johnson v. State, 885 S.W.2d 641, 645 (Tex.App.--Waco
1994, pet. ref'd).  By letter, this Court also notified appellant
of his opportunity to submit a response to the Anders brief and motion
to withdraw filed by his counsel. 
Appellant has not filed a response.

In conformity with
the standards set out by the United States Supreme Court, we will not rule on
the motion to withdraw until we have independently examined the record.  Nichols v. State, 954
S.W.2d 83, 86 (Tex.App.BSan
Antonio 1997, no pet.).  If this Court
determines the appeal has merit, we will remand it to the trial court for
appointment of new counsel.  Stafford v. State, 813 S.W.2d 503, 511 (Tex.Crim.App.1991).

Counsel concludes
the court did not abuse its discretion in revoking appellant=s community
supervision.  Appellant plead Atrue@ to all but two of
the State=s allegations.  A plea of Atrue@ to even one
allegation in the State=s motion is sufficient to support a
judgment revoking community supervision. 
Cole v. State, 578 S.W.2d 127, 128 (Tex.Crim.App. 1979); Lewis v. State, 195 S.W.3d 205,
209 (Tex.App.BSan
Antonio 2006, pet. denied).  

Counsel also
determines the record does not support a contention that the court acted
outside the zone of reasonableness in imposing appellant=s sentence as it
was within the range proscribed by the Penal Code for this offense.  See Tex. Penal Code Ann. ' 22.02 (Vernon
2009); Tex. Penal Code Ann. ' 12.33 (Vernon
2007).  See also Jordan v.
State, 495 S.W.2d 949, 952 (Tex.Crim.App. 1973); Rodriguez
v. State, 917 S.W.2d 90, 92 (Tex.App.BAmarillo 1996,
pet. ref=d) (Texas courts
have traditionally held that as long as the sentence is within the range of
punishment established by the Legislature in a valid statute, it does not
violate state or federal prohibitions). 
Counsel does note that the judge expressed displeasure that appellant
denied the use of the brick in the assault after entering a plea of guilty to
the charge and signing plea papers admitting he used the brick in the 2004
assault.  However, counsel concludes that
while this may have factored into the trial court=s sentencing
decision, there is no indication in the record that he did not or could not
consider the entire applicable range of punishment.  We agree. 
Our review convinces us that appellate counsel conducted a
complete review of the record.  We have
also made an independent examination of the entire record to determine whether
there are any arguable grounds which might support the appeal from the
revocation and sentence.  We agree the record presents no arguably
meritorious grounds for review. 
Accordingly, we grant counsel's motion to withdraw[2] and affirm the judgment of the trial court.

 

                                                                                                James
T. Campbell

                                                                                                            Justice

 

Do not
publish.











[1]  See Tex. Penal Code Ann. '
22.02 (Vernon 2009).





[2]Counsel shall, within five days after
the opinion is handed down, send his client a copy of the opinion and judgment,
along with notification of the defendant=s right to file a pro se petition for discretionary
review.  See Tex. R. App. P. 48.4.